**Alexandria**

ROBERT W. WILLIAMS

v.

COMMONWEALTH OF VIRGINIA

No. 0032-85

Decided March 17, 1987

COUNSEL

Kenneth W. Smith, for appellant.

Margaret Poles Spencer, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee.

OPINION

**KEENAN, J.** — Robert W. Williams was convicted of possession of cocaine with intent to distribute. He was sentenced in accordance with the jury's verdict to seven years incarceration and a fine of $12,000. On appeal, Williams argues that he was illegally detained; that the search which produced the cocaine was illegal; that he was denied the right to speak with an attorney and compelled to make incriminating statements; that the court improperly admitted evidence of a taped conversation he engaged in with his cocaine supplier at the request of the police; that the Commonwealth failed to disclose a plea agreement with his codefendant, Steven Frazier; that the prosecutor improperly commented on his failure to testify; and that the Commonwealth failed to prove that he exercised dominion and control over the cocaine. We find no reversible error and affirm.

## I. *FACTS*

This case presents many factual conflicts between Williams' testimony at the suppression hearing and the testimony of the police officers who were involved. We view the evidence in the light most favorable to the Commonwealth, as the prevailing party below, and grant to it all reasonable inferences fairly deducible therefrom. *Crumble v. Commonwealth*, 2 Va. App. 231, 233, 343 S.E.2d 359, 361 (1986).

On January 27, 1984, Detective Tamez of the Arlington County Police Department applied for a search warrant for 922 North Cleveland Street, Arlington. An affidavit filed by Tamez in support of the application stated that he had received information from two confidential sources that Williams and Frazier were distributing cocaine in Arlington. Tamez's affidavit related the following information from one source: "Williams was from South Carolina and would have cocaine sent through the mail to the Arlington area, transport it to an address at 922 North Cleveland Street and would eight [sic] it and cut it for sale. C/S [confidential source] stated that Williams drove a 1969 or 1970 Pontiac Firebird that was orange in color." The affidavit also related that

a person in South Carolina named David Via was supplying Williams the cocaine.

Tamez further stated in his affidavit that Detective Cope of the Arlington County Narcotics Unit observed a 1968 orange Firebird with South Carolina tag #UFZ 286 parked in front of 922 North Cleveland Street and that a check with South Carolina authorities revealed that the car belonged to Williams. The affidavit also stated that according to South Carolina authorities, Williams had "an extensive drug related criminal history" and that he should not have been out of South Carolina due to the fact that he was on parole or probation for a 1980 drug conviction. Finally, the affidavit stated that, according to one confidential source, Williams was "interested in leaving the area," and that he was "currently at 922 North Cleveland Street . . . in possession of approximately 30 grams of cocaine." The affidavit did not state how the confidential sources acquired their knowledge, nor did it state whether the sources had any personal knowledge of the information given.

A search warrant was issued at 12:15 p.m. The warrant authorized a search of "all the basement area of 922 Cleveland Street, Arlington, Virginia, which is known to be the residence of Steve Frazier." Before obtaining the warrant, Tamez assigned two other detectives (Robinson and Hackert) to conduct a surveillance of the house. Tamez told the others to notify him if Williams attempted to leave. As Tamez was enroute to the house with the search warrant, Robinson radioed to him that Williams had gotten into a car and driven away. Tamez instructed Robinson to stop Williams and, as it turned out, both police vehicles combined to pull Williams over approximately three to four blocks from the house. Tamez did not have an arrest warrant for Williams or a search warrant for his car. Further, he had not observed Williams breaking the law.

Upon making the stop, Tamez asked Williams to get out of his car. Detective Robinson patted him down for weapons. Robinson felt a bulge, reached into Williams' pocket and removed eleven one hundred dollar bills. Detectives Tamez and Cope indicated that money was included in the search warrant and instructed Robinson to turn it over to them.

Tamez informed Williams of the search warrant for the house and stated that he and the other officers were on their way there to search for cocaine. According to Tamez, Williams denied that there was any cocaine at the house. Tamez further testified that Williams volunteered to take the officers back to the house. Williams denied this at the suppression hearing. He stated that he "was told to get in their car and we were going back to 922 North Cleveland Street." Although Williams testified that the officers had their guns drawn, Tamez denied this. The prosecution does not dispute that Williams was not told that he was free to leave; however, he was not handcuffed and Tamez testified that Williams was not under arrest at this point. The court found that Williams had been detained but not arrested. No specific finding was made whether Williams voluntarily returned to the house.

After arriving back at the house, Williams led the police into the basement apartment of Steve Frazier. In order to reach the apartment, they had to go into the basement and down a short hallway. The officers found Frazier in the apartment. Frazier and Williams were instructed to sit on the bed while the search warrant was executed. Tamez located a "hotbox" underneath the sofa bed. He also found a set of scales, "a bottle of cut," a plastic bag and some other paraphernalia in the living room area of the apartment.

Detective Cope found a briefcase "in the closet space area of the basement." This closet, which was about ten feet away from the apartment door, was located in the hallway they had just walked through to reach the apartment. Tamez took the briefcase back into the apartment and asked Williams and Frazier whether it belonged to either one of them. When both denied ownership, Tamez broke open the briefcase with a knife. Inside, he found dilauded, marijuana and cocaine. He also found Williams' resume.

Williams and Frazier were then placed under arrest, handcuffed and read their *Miranda* rights. Williams was taken to the police station where he was again advised of his rights. He also signed a form acknowledging that these rights had been read to him and that he understood them. Williams claimed at the suppression hearing that he requested an attorney but was instead offered an assistant commonwealth's attorney. Tamez, Robinson and Cope all testified that Williams understood his rights and never asked for his own attorney. According to the officers' testimony,

Williams requested to see a commonwealth's attorney for the purpose of confirming that the police would comply with an agreement being offered. At the suppression hearing, Tamez described the agreement which was reached with Williams. He stated that "in return for Mr. Williams' cooperation on his supplier of cocaine to the Arlington area . . . he would be charged with one count of possession with intent to distribute cocaine with no recommendation and would not be charged with the dilauded or marijuana."

Pursuant to his agreement with the police, Williams contacted his supplier in North Carolina and ordered some cocaine. The conversation between Williams and his supplier was taped. Tamez testified at trial that prior to the conversation he gave Williams "a basic outline of what he needed to do in order to fulfill his side of the bargain, that was to get [the supplier] to admit that he was involved in this particular case and to make a delivery to Arlington, Virginia." At trial, the tape was played for the jury over Williams' objection that the conversation was irrelevant, prejudicial and inflammatory. The court ruled that the taped conversation was admissible since it showed Williams' knowledge and method of operation, thus tending to establish his intent to distribute.

In addition to the tape, the jury heard the testimony of Detectives Tamez, Robinson and Cope.

Tamez testified that after Williams was given his *Miranda* warnings, he admitted that he was receiving cocaine from a supplier named Ernest Pack in North Carolina. Williams further admitted to Tamez that he was selling the cocaine and sending the money to Pack through Western Union. In fact, Williams told Tamez that he was on his way to wire the money found in his possession to Pack at the time of his detention. Finally, Williams told Tamez that Frazier had nothing to do with this distribution scheme.

The jury also heard the testimony of Stephen Frazier. According to Frazier, Williams approached him in early January 1984 with an offer to join his drug dealing operation. Frazier and Williams had known each other since childhood and Williams was dating Frazier's sister at the time. Frazier testified that Williams had recently moved back to Virginia from South Carolina and

was interested in using his contacts in the Carolinas to set up a drug dealing business in Arlington.

The proposed plan, according to Frazier, was for Williams to obtain the drugs from his Carolina contacts. Frazier would then be the local distributor. Frazier testified: "Bobby [Williams] knew how to handle the business . . . Bobby would be the brains of the organization and I will be like an associate or an employee of this little group." Frazier stated that he rejected the idea; however, he continued to allow Williams to stay at the Cleveland Street house when he was in town.

On both direct and cross-examination, Frazier acknowledged that as a result of the January 27 search, he was facing charges for possession of cocaine and marijuana with intent to distribute. He further acknowledged that these cases had not come to trial. At the beginning of the second day of trial, shortly before the jury was to be instructed, defense counsel moved for a mistrial on the ground that the Commonwealth had failed to disclose an agreement with Frazier for his testimony against Williams. Counsel stated that during the previous evening he had been informed of the existence of such an agreement by Frazier's sister, Mary Breeden. Breeden had testified on Williams' behalf the previous day. The Commonwealth represented that no such agreement had been reached.

The court denied Williams' motion for a mistrial, finding that there was no evidence of an agreement between Frazier and the Commonwealth. Williams' counsel then asked permission to put Breeden on the stand so that she could testify regarding certain conversations she had with prosecution witnesses. The court refused this request on the grounds that Breeden had remained in the courtroom the previous day after her testimony and had then conferred with defense counsel and with Williams. Counsel then proffered what Breeden's testimony would be. Counsel also asked permission to further examine Frazier and Tamez. This motion was denied.

In his closing argument, Williams' counsel summarized the evidence in the light most favorable to Williams. He prefaced his argument with the questions: "[W]hat is the evidence in this case? Where is the evidence that Robert Williams possessed any cocaine or other controlled substance, and where is the evidence

that he was planning to or attempting to distribute or sell cocaine to anyone else?" In rebuttal, the prosecutor said to the jury: "[C]ounsel said to you where is the evidence that he [Williams] is guilty. I ask you where is the evidence that he isn't guilty. All of the evidence in this case has shown this man . . ." At this point, defense counsel objected, stating: "I object, Your Honor, her instructing the jury that there's any . . ." The court interposed: "The objection is overruled as such. The jury is not bound by argument of counsel. The jury may accept or reject it." No further objection was made by counsel.

After argument was completed, the case was submitted to the jury which returned a verdict of guilty and sentenced Williams to seven years in the penitentiary and a fine of twelve thousand dollars ($12,000).

## II. *THE WARRANTLESS STOP*

The first issue we deal with is whether Williams' initial detention was illegal. Williams argues, and the Commonwealth does not dispute, that his detention was a seizure within the meaning of the fourth and fourteenth amendments to the United States Constitution, thus invoking the protections contained therein. *See Delaware v. Prouse*, 440 U.S. 648, 653 (1979). The question is whether the seizure of Williams, approximately four blocks from the house where he was staying and where the police were enroute with a search warrant, was unreasonable.

It is important to note first that the trial court made a finding that Williams was detained rather than arrested. Further, our review of the trial court's oral decision, rendered at the conclusion of the suppression hearing, convinces us that implicit within its decision was a finding that Williams voluntarily returned to 922 North Cleveland Street with the officers. While it would have been preferable to have ruled more explicitly, the court's resolution of the conflicting testimony in the Commonwealth's favor leaves no doubt that the court credited the officers' version of events. With this understanding of the court's decision, we turn to the applicable law.

The Commonwealth advances two justifications for the initial detention of Williams. First, it argues that the stop was a permissible detention under the authority of *Terry v. Ohio*, 392 U.S. 1

(1968). Second, it argues that under the rule established in *Michigan v. Summers*, 452 U.S. 692 (1981), the police, armed with a search warrant for Williams' residence, were entitled. to detain him while the warrant was executed.[1]

■ In *Terry*, the United States Supreme Court held that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possible criminal behavior even though there is no probable cause to make an arrest." 392 U.S. at 22. The Court has since stated: "[I]f there are articulable facts supporting a reasonable suspicion that a person has committed a criminal offense, that person may be stopped in order to identify him, to question him briefly, or to detain him briefly while attempting to obtain additional information." *Hayes v. Florida*, 470 U.S. 811, 816 (1985). The Court made clear in *Adams v. Williams*, 407 U.S. 143 (1972), that reasonable cause for a *Terry* stop can be based on an informant's tip. *Id.* at 147. This is true even where such information may be insufficient to support issuance of an arrest or search warrant. *Id.* Further, in *Pennsylvania v. Mimms*, 434 U.S. 106 (1977), the Supreme Court held that the principles of *Terry* apply equally to the stop of a suspect who is traveling in an automobile.

■ Particularly relevant to the present case, where the search warrant specifically mentioned Williams, is the court's observation in *Summers*:

> [D]etention represents only an incremental intrusion on personal liberty when the search of a home has been authorized by a valid warrant . . . . A judicial officer has determined that police have probable cause to believe that someone in the home is committing a crime. Thus a neutral magistrate rather than an officer in the field has made the critical determination that the police should be given a special authorization to thrust themselves into the privacy of a home. The connection of an occupant to that home gives the police officer an easily identifiable and certain basis for determining that suspicion of criminal activity justifies a detention of that

---

[1] In *Summers*, the police, who had a search warrant for the defendant's home, detained the defendant while he was coming down his front steps. The Court held that the search warrant carried with it the limited authority to require Summers to re-enter and remain in the house while the search warrant was executed. 452 U.S. at 705.

occupant.

452 U.S. at 703-04 (footnote omitted).

██ "In order to determine what cause is sufficient to authorize police to stop a person, cognizance must be taken of the 'totality of the circumstances—the whole picture.' Assessing that whole picture, 'the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Leeth v. Commonwealth*, 223 Va. 335, 340, 288 S.E.2d 475, 478 (1982)(quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)).

██ Turning to the facts of the present case, the officers who detained Williams clearly possessed sufficient articulable facts to support a reasonable suspicion that Williams was, or had been, engaged in criminal activity. Officer Tamez had been informed that Williams was in possession of contraband and that he was engaged in distribution of that contraband. Further, Tamez had a search warrant for the residence from which Williams was said to be carrying on this activity and from which Williams had departed moments earlier. Tamez also knew that Williams had a history of drug related offenses. We hold that this information provided Tamez with a sufficient basis to order that Williams be briefly detained for questioning under the authority of *Terry*. As the Court stated in *Adams*:

> The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognized that it may be the essence of good police work to adopt an intermediate response. A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.

407 U.S. at 145-46 (citations omitted).

Williams contends, however, that his detention cannot be justified as a *Terry* stop because the officers exceeded the scope of an investigatory detention when they took him back to the house and

"secured" him during execution of the search warrant. Williams relies on *Hayes v. Florida*, 470 U.S. 811, 816 (1985), where the Court stated:

> And our view continues to be that the line [in *Terry*] is crossed when the police, without probable cause or a warrant, forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station where he is detained, although briefly, for investigative purposes.

*Id.* at 816.

We find that Williams' reliance on *Hayes* is misplaced. In *Hayes*, the defendant did not agree to be transported to the police station until he was told that he would be arrested if he did not agree. *Id.* at 812. In the present case, the testimony of the officers established that Williams *volunteered* to take them back to the house when he was informed that they had a search warrant. Williams was not, therefore, forcibly removed from a place he was entitled to be, as was the case in *Hayes*. Although Williams denied having volunteered to go back to the house, the court was entitled to credit the officers' testimony to the contrary.

Williams next argues that even if the stop was permissible under *Terry*, the pat-down search was not. In this regard, Williams argues that the police used the pat-down as a pretext to search him for drugs. He further argues that Officer Robinson could not have reasonably believed that the roll of bills felt through his pocket was a weapon.

█ Once a police officer has properly detained a suspect for questioning he may conduct a limited pat-down search for weapons if he reasonably believes that the suspect might be armed and dangerous. *Adams*, 407 U.S. at 146; *Landsdown v. Commonwealth*, 226 Va. 204, 211, 308 S.E.2d 106, 112 (1983), *cert. denied*, 465 U.S. 1104 (1984); *Glover v. Commonwealth*, 3 Va. App. 152, 155-56, 348 S.E.2d 434, 437 (1986); Code § 19.2-83. As the foregoing suggests, the authority to conduct a pat-down search does not automatically accompany an investigative detention. *United States v. Post*, 607 F.2d 847, 851 (9th Cir. 1979); *see Ybarra v. Illinois*, 444 U.S. 85, 92-93 (1979); *Sibron v. New York*, 392 U.S. 40, 64 (1968). Only where the officer can "point

to particular facts from which he reasonably inferred that the individual was armed and dangerous" is he justified in searching for weapons. *Sibron*, 392 U.S. at 64.

■ "Among the circumstances to be considered in connection with this issue are the 'characteristics of the area' where the stop occurs, the time of the stop, whether late at night or not, as well as any suspicious conduct of the person accosted such as an obvious attempt to avoid officers or any nervous conduct on the discovery of their presence." *United States v. Bull*, 565 F.2d 869, 870-71 (4th Cir. 1977), *cert. denied*, 435 U.S. 946 (1978). To this, we add the character of the offense which the individual is suspected of committing as a circumstance which the officer may consider. *See Terry*, 392 U.S. at 28.

■ Although suspicion of narcotics possession and distribution is not universally recognized as a circumstance which, standing alone, gives rise to an inference of dangerousness, we believe that the better view is that it does. *See Post*, 607 F.2d at 851. The Supreme Court implied as much in *Summers* when it stated: "[T]he execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence." 452 U.S. at 702.

We hold, therefore, even though the officers who detained Williams had no information that he was armed or that he had a past history of violence, they acted reasonably when conducting a protective pat-down search for weapons in light of the fact that they had a reasonable suspicion that Williams was presently engaged in narcotics distribution. To hold otherwise would be an invitation to violence in what is always a potentially explosive situation.

■ While conducting the pat-down search, Detective Robinson felt "a bulge" in Williams' pocket. Robinson testified that it was "an object that felt big and it was bulging out of his pocket." He further testified: "[I]t felt hard. It wasn't soft like a piece of cotton." What Robinson felt turned out to be eleven one hundred dollar bills which were rolled up. To justify removal of this item from Williams' pocket, it was not necessary that the item actually be a weapon. Robinson was entitled to remove the item if he reasonably believed that it could be a weapon. *Landsdown v. Commonwealth*, 226 Va. 204, 213, 308 S.E.2d 106, 112 (1983); *Simmons v. Commonwealth*, 217 Va. 552, 556, 231 S.E.2d 218,

221 (1977).

Robinson stated that when he felt the bulge, he could not identify the item. We cannot say as a matter of law that Robinson could not have believed the rolled up bills constituted some sort of weapon. In *Simmons*, the court upheld the seizure of a "hard object" which turned out to be a pocket tape recorder. 217 Va. at 556-57, 231 S.E.2d at 222. Similarly, in *Landsdown*, the court upheld the seizure of a rectangular brass box. 226 Va. at 213, 308 S.E.2d at 112. We hold that Robinson's seizure of the rolled up bills from Williams' pocket was not illegal.

### III. *VALIDITY OF THE SEARCH WARRANT*

Williams next argues that the search warrant for Frazier's apartment was invalid because it was not supported by probable cause and because it did not describe the area to be searched with sufficient particularity. We reject both of these arguments.

The standard which we apply in reviewing a magistrate's probable cause determination is whether, considering the totality of the circumstances, the magistrate had a substantial basis for concluding that probable cause existed. *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983); *Garza v. Commonwealth*, 228 Va. 559, 563, 323 S.E.2d 127, 129 (1984). We are further mindful that a magistrate may draw reasonable inferences from the material supplied to him and that his determination of probable cause " 'should be paid great deference by reviewing courts.' " *United States v. Settegast*, 755 F.2d 1117, 1121 (5th Cir. 1985)(quoting *Gates*, 462 U.S. at 236). "A deferential standard of review is appropriate to further the Fourth Amendment's strong preference for searches conducted pursuant to a warrant." *Massachusetts v. Upton*, 466 U.S. 727, 733 (1984).

Where a search warrant is issued on the basis of information provided to the police by confidential sources, factors which have been considered relevant to the probable cause determination are the veracity and basis for knowledge of the source, *Gates*, 462 U.S. at 230; the extent the detail provided, *Id.* at 245; whether the police have been able to corroborate aspects of the source's information, *Id.* at 241; and whether the source is "an unquestionably honest citizen." *Id.* at 233.

In the present case, two confidential sources described as "concerned citizen[s]" informed Detective Tamez in some detail that Williams and Frazier were receiving and selling controlled substances from 922 North Cleveland Street, Arlington. Independent police investigation corroborated certain aspects of the information provided by the sources. The police were able to confirm, for example, that Williams was the owner of the late 1960's model orange Firebird with South Carolina license plates that was parked outside of 922 North Cleveland Street. They were further able to confirm that Williams' alleged supplier, David Via, was an associate of Williams in South Carolina and that he had a criminal history. Finally, the police learned through their own investigation that Williams had "an extensive drug related criminal history" and that he should not have been out of South Carolina because he was on either parole or probation for a 1980 drug conviction.

 Although the affidavit did not state the sources' basis of knowledge, or vouch for their veracity, a magistrate reviewing the information provided to Tamez could reasonably infer from its detail that the sources had access to reliable information. This is particularly true where, as here, aspects of the information are corroborated by police investigation. *See Gates*, 462 U.S. at 245-46. Further, the Supreme Court has observed that "if an unquestionably honest citizen comes forward with a report of criminal activity—which if fabricated would subject him to criminal liability—we have found rigorous scrutiny of the basis of his knowledge unnecessary." *Id.* at 233-34.

When the information provided by Tamez's sources is combined with the corroborative efforts of the police and the information which the police were able to learn on their own, "the pieces fit neatly together . . . [to] support the Magistrate's determination that there was 'a fair probability that contraband or evidence of a crime' would be found" in Frazier's apartment. *Upton*, 466 U.S. at 733 (quoting *Gates* 462 U.S. at 238). We hold, therefore, that the search warrant was not improperly issued.

Williams' final arguments regarding execution of the search warrant are that the warrant did not describe the place to be searched with sufficient particularity and that the seizure of the briefcase from the hallway closet went beyond the scope of the area to be searched as described in the warrant.

 Initially, we reject Williams' challenge to the search of the briefcase because we find that he lacks standing to contest this action by the police. It is well settled that "in order to obtain protection against unreasonable searches and seizures [a defendant] bears the burden of proving that he has standing to assert the constitutional right." *McCoy v. Commonwealth*, 2 Va. App. 309, 311, 343 S.E.2d 383, 384 (1986). "[D]efendants charged with crimes of possession may only claim the benefits of the exclusionary rule if their own Fourth Amendment rights have in fact been violated." *United States v. Salvucci*, 448 U.S. 83, 85 (1980).

As this court stated in *McCoy*:

> The test is whether the appellant objectively had a reasonable expectation of privacy at the time and place of the disputed search. In making the analysis the court looks to the "totality-of-the-circumstances."

2 Va. App. at 311, 383 S.E.2d at 385 (citations omitted).

 We find that Williams failed to establish a reasonable expectation of privacy with regard to the briefcase. At the time the officers found the briefcase, they brought it to Williams and asked whether it belonged to him. He replied that it did not. By disclaiming ownership of the briefcase, Williams abandoned it for fourth amendment purposes. *See United States v. Williams*, 538 F.2d 549, 550-51 (4th Cir. 1976).

Williams argues, however, that the entire search was invalid because the scope of the warrant was overly broad. The warrant authorized a search of "all of the basement area known to be the residence of Steven Frazier at location 922 North Cleveland Street, Arlington, Virginia." Williams argues that this description was not sufficiently definite because Frazier occupied an apartment in the basement of a house which was also rented to other tenants. He further points out that Detective Tamez testified that he had "no idea where Mr. Frazier's apartment begins and ends."

 In *Manley v. Commonwealth*, 211 Va. 146, 176 S.E.2d 309 (1970), *cert. denied*, 403 U.S. 936 (1971), the Supreme Court discussed the constitutional requirement that a search warrant describe the place to be searched with sufficient particularity. The Court stated:

Under the Constitution of the United States and the statutory law of Virginia it is essential to the validity of a search warrant that it describe with particularity the place to be searched. All that is required, however, is that the description be such that the officer charged with executing the search warrant can, with reasonable effort, ascertain and identify the place intended.

211 Va. at 151, 176 S.E.2d at 314.

▮ The court acknowledged that a warrant directed against part of a multiple-occupancy structure must "describe the particular sub-unit to be searched with sufficient definiteness to preclude search of other units located in the larger structure and occupied by innocent persons." *Id.* The court stated, however, that as an exception to the general rule, a warrant will not be declared invalid "where it adequately specifies the name of the occupant of the sub-unit against which it is directed and provides the searching officers with sufficient information to identify, without confusion or excessive effort, such apartment unit." *Id.* at 151-52, 176 S.E.2d at 314.

In *Manley*, where the building to be searched contained only five sub-units, the Supreme Court held that a warrant which only authorized the search of the defendant's apartment was sufficiently definite. *Id.* at 152, 176 S.E.2d at 314. Similarly, because Frazier was the sole tenant of the basement, the warrant which only authorized a search of "the basement area known to be the residence of Steven Frazier," was sufficiently definite to pass constitutional and statutory scrutiny.

## IV. *VOLUNTARINESS OF STATEMENTS*

Williams next argues that during his interrogation at the Arlington County police station he was denied the right to consult with an attorney. He further argues that his statements were involuntary because they were induced by police promises not to prosecute certain charges in return for his cooperation. Finally, he argues that his statements should have been suppressed as the result of an illegal detention.

The trial court heard conflicting testimony regarding Williams' claim that he was denied the right to speak with an attorney. At

the suppression hearing, Williams testified that he asked for an attorney but was only offered an assistant commonwealth's attorney. According to Williams, when he was not allowed to contact an attorney, he "was content that it was as far as [he] was going to get at that time." Williams testimony was contradicted by Tamez, Robinson, and Cope, who all testified at the suppression hearing that Williams did not ask for his own attorney. They testified that Williams asked to speak to a commonwealth's attorney for the purpose of confirming that the police would not prosecute certain charges against him in exchange for his cooperation in setting up his alleged supplier, Ernest Pack.

Williams does not dispute that he was advised of his constitutional rights at the time of his arrest and again when he arrived at the police station. In addition, Williams executed a form entitled, "Advice on Constitutional Rights," acknowledging that these rights had been read to him and that he understood them.[2] The form advised Williams of his right to counsel and his right to remain silent. It also contained a warning that anything he said could be used against him. At the suppression hearing, Williams acknowledged that he was "very well aware of [his] rights" and that he knew better than "to talk to anyone without [an attorney]." He further acknowledged that he had not been forced or coerced into talking to the police.

After hearing the evidence regarding the circumstances leading to Williams' statements, the trial court ruled that Williams "knowingly, freely and voluntarily gave the statement to the police." The court further held that there had been no violation of Williams' rights.

 The standard of review in cases such as this was stated by the Supreme Court in *Rogers v. Commonwealth*, 227 Va. 605, 318 S.E.2d 298 (1984). There, the Court stated that when a trial court's determination of voluntariness is appealed, the scope of review is "limited to the question whether the evidence supports the finding." *Id.* at 608, 318 S.E.2d at 300. Under the test applied in *Rodgers*, we must determine here whether in light of the totality of the circumstances the trial court was plainly wrong in concluding that Williams' statements were the product of his free and

---

[2] Detective Tamez referred to this form as a "rights waiver" form; however, the form only advises a suspect of his rights. It does not contain a waiver clause.

unconstrained choice and that his will was not overborne. *See id.* at 609, 318 S.E.2d at 300.

We find that the testimony from the police witnesses, as well as from Williams himself, amply supports the trial court's finding that Williams' statements were voluntary and that his rights were not violated. The question whether Williams asked to see an attorney, other than a commonwealth's attorney, was a factual matter which the court was entitled to resolve against Williams based on the testimony of the police officers.

On the question of voluntariness, the record fails to support Williams' contention that he was enticed into making statements by the promises of the police to drop certain charges. Williams was experienced with the criminal justice system. Testifying on his own behalf at the suppression hearing, he conceded that he had not been coerced and that he was well aware of his rights. At no time did Williams testify that his statements were induced by promises of leniency. Even if we were to assume that improper promises were made to him, this would be only one factor in the totality of circumstances. *See Rodgers,* 227 Va. at 614, 318 S.E.2d at 304. In the absence of any indication that Williams' statements were made in response to such promises, this factor alone could not result in a finding that Williams' waiver of his right to remain silent was involuntary. "Absent police conduct *causally related* to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." *Colorado v. Connelly,* _____ U.S. _____, _____, 107 S. Ct. 515, 520 (1986) (footnote omitted).

Finally, in view of our finding that Williams' initial detention was not illegal, we reject his argument that his statements should have been suppressed as fruit-of-the-poisonous-tree.

## V. *ADMISSIBILITY OF THE TAPED CONVERSATION*

Pursuant to his agreement to cooperate with the police in securing evidence against his alleged cocaine supplier, Ernest Pack, Williams called Pack and purported to order some cocaine. Over Williams' objection, a tape of this conversation was played for the jury at trial. The court allowed the tape to be played on the ground that it tended to show Williams' intent to distribute cocaine by showing his knowledge and method of operation.

We agree with Williams that the court erred in admitting this evidence. The taped conversation was a staged event in which Williams was doing nothing more than playing his assigned role. Further, he was doing this under police supervision and had even been told in general terms by Tamez "what he needed to do in order to fulfill his side of the bargain." Under the circumstances, the conversation does not demonstrate Williams' intent to do anything other than cooperate with the police.

The Commonwealth argues, however, that the conversation was admissible because it occurred after Williams had been advised of his *Miranda* rights and thus knew that *anything* he said could be used against him. We reject this argument. Regardless of whether the conversation was voluntarily undertaken after proper warnings, the question remains whether it was probative of any issue at trial. "Evidence which has no tendency to prove guilt, but only serves to prejudice an accused, should be excluded on the ground of lack of relevancy. For evidence to be admissible it must relate and be confined to matters in issue and tend to prove an offense or be pertinent thereto." *Bunting v. Commonwealth*, 208 Va. 309, 314, 157 S.E.2d 204, 208 (1967).

We believe that the taped conversation, which was nothing more than role playing on Williams' part, did not tend to prove his intent to distribute cocaine. Accordingly, it should not have been admitted into evidence. This does not mean, however, that the conviction must be reversed. "A conviction should not be reversed unless the introduction of improper evidence suggests a manifest probability that it was prejudicial to the defendant." *Boykins v. Commonwealth*, 210 Va. 309, 313, 170 S.E.2d 771, 774 (1969).

The cases of the Supreme Court of Virginia suggest that no prejudice results to a defendant where the fact sought to be established by improperly admitted evidence is also established by overwhelming competent evidence. In such cases, the court has found harmless error and affirmed the conviction. *See Hopkins v. Commonwealth*, 230 Va. 280, 287-88, 337 S.E.2d 264, 269 (1985), *cert. denied*, ____ U.S. ____, 106 S. Ct. 1498 (1986); *Brooks v. City of Newport News*, 224 Va. 311, 316, 295 S.E.2d 801, 804 (1982); *Black v. Commonwealth*, 223 Va. 277, 284-85, 288 S.E.2d 449, 453 (1982); *Rozier v. Commonwealth*, 219 Va. 525, 528, 248 S.E.2d 789, 791 (1978). The question is whether, absent the improper evidence, the trier of fact could have reached any

other reasonable conclusion regarding the defendant's guilt.

Reviewing the record of trial in the present case, we find that, even without the taped conversation, the evidence of Williams' intent to distribute cocaine was overwhelming. Approximately twenty-seven grams of cocaine were found in Williams' briefcase. The police found eleven hundred dollars on his person. Detective Tamez testified that in executing the search warrant, he found several items which are frequently used in the packaging and distribution of cocaine. These items included a "hot box" used for measuring the purity of cocaine, scales, plastic bags, and anestitole, used to cut the purity of cocaine for street distribution.

The inference that these items were being used to distribute the cocaine found in Williams' briefcase was confirmed by Tamez's further testimony that Williams told him, after being read his *Miranda* rights, that he "was being supplied quantities of cocaine by an individual by the name of Ernie Pack in Forrest City, North Carolina." Tamez also testified that Williams told him he was on his way to wire the eleven hundred dollars found in his pocket to Pack at the time the police stopped him.

In addition to the testimony of Tamez, the jury heard evidence regarding Williams' intent to distribute from Stephen Frazier. Frazier described how Williams had planned to set up a drug distribution business in Arlington by receiving cocaine from his suppliers in the Carolinas. According to Frazier, the cocaine would either be brought to Virginia by Williams or sent by an overnight mail delivery service. This testimony was corroborated in part by the discovery in the house of an overnight express envelope addressed to Williams and marked from South Carolina. Frazier also provided testimony that Pack was involved in Williams' plans.

In view of the evidence previously described, it is apparent that the taped conversation did not provide the jury with any information it would not otherwise have had. The competent evidence regarding Williams' intent to distribute, particularly Williams' statements to Tamez, was sufficiently strong that no reasonable jury could have reached a verdict other than guilt. We hold, therefore, that admission of the taped conversation was harmless error.

## VI. *REFUSAL TO RECALL WITNESSES*

Williams argues that the court improperly limited his rights to cross-examine prosecution witnesses by refusing his motion to recall Mary Breeden, Stephen Frazier and Detective Tamez. Williams further argues that the court should have declared a mistrial based on the Commonwealth's failure to disclose exculpatory evidence; to-wit, a plea agreement with Frazier in exchange for his testimony against Williams. Williams' motion came on the second day of trial. All of the evidence had been presented, but the jury had not yet been instructed, nor had argument taken place. The basis for Williams' motion was his allegation that Frazier's sister, Mary Breeden, who had previously testified on behalf of Williams, had overheard a conversation the prior day between Frazier and Tamez. Counsel alleged that the conversation involved an agreement regarding Frazier's testimony against Williams. Earlier, Frazier had testified that the charges against him stemming from the search of his apartment were still pending. No evidence had been produced, however, that Frazier was testifying pursuant to a plea agreement.

In making his motion, defense counsel argued: "Ms. Breeden was privy to conversations among the Commonwealth's witnesses yesterday and it has (sic), based on that, that we believe that a deal had been made and that it has been concealed from the defense." The prosecutor denied that any deal had been made with Frazier. Defense counsel then argued: "[Y]our Honor, it appears to be from statements which I believe were made by Mr. Frazier in the other witnesses' presence yesterday that he believes that he is not going to get any penitentiary time or jail time." Counsel stated that his suspicions were further aroused by the fact that Frazier's trial date had been postponed until after Williams' trial.

Counsel then asked permission to recall Breeden as a witness and proffered that her testimony "would be that what she has told me is that her belief that there is an agreement was based on remarks made by Detective Tamez during yesterday's trial." Counsel also asked to recall Frazier and Tamez "in order to cross-examine them on the basis of this agreement between them." The court refused to recall either witness and ruled that Breeden could not testify since she had been present during argument on the motion and had earlier conferred with Williams and his counsel.

 The rule in Virginia, as stated by the Supreme Court, is as follows:

> When all the testimony in the trial of a case has been concluded and the witnesses for the respective parties have been excused from their attendance upon court, whether the court will allow the introduction of other testimony is a question addressed to the sound discretion of the trial judge, ". . .and unless it affirmatively appears that this discretion has been abused, this court will not disturb the trial court's ruling thereon."

*Mundy v. Commonwealth*, 161 Va. 1049, 1064, 171 S.E. 691, 696 (1933) (quoting *Bishop v. Webster*, 154 Va. 771, 778, 153 S.E. 832, 834 (1930)).

We cannot say as a matter of law that the trial court abused its discretion in refusing to allow further testimony from Breeden, or cross-examination of Frazier and Tamez. Aside from the speculations of counsel regarding an undisclosed plea agreement, the only proffer of evidence was the assertion that Breeden could testify as to her *belief* that such an agreement existed. The basis for her knowledge was said to be a conversation she had overheard between Frazier and Tamez. The details of this conversation which caused Breeden to believe that an agreement existed were not disclosed to the court. On the other hand, the prosecutor specifically represented to the court that no plea agreement existed with Frazier. Further, the jury was aware that Frazier was facing charges and that these charges were still pending. Breeden's belief in the existence of a plea agreement would not have added anything relevant to the jury's knowledge. Under the circumstances, we believe that the court acted within its discretion in refusing to reopen Williams' case for the purpose of allowing the jury to hear that Breeden believed Frazier was testifying pursuant to a plea agreement. We note also that Breeden's proffered testimony would not have established the failure of the Commonwealth to disclose exculpatory evidence.

 Regarding Williams' motion to recall Frazier and Tamez, we recognize that cross-examination of prosecution witnesses regarding a potential motive for providing testimony favorable to the Commonwealth is "fundamental to the truth-finding process

[and] is an absolute right guaranteed to an accused by the confrontation clause of the Sixth Amendment." *Barrett v. Commonwealth*, 231 Va. 102, 108, 341 S.E.2d 190, 194 (1986). A trial court, however, "may exercise discretion to see that the right of cross-examination is not abused [once] the right to cross-examine has been fairly and substantially exercised." *Id.*

Here, counsel cross-examined both Frazier and Tamez during the trial. At that time, counsel did not ask either witness whether a plea agreement existed. Counsel did ask Frazier what happened to the charges against him and Frazier's response was that they had not yet come to trial. Counsel chose not to probe further. While the better practice may have been for the court to have heard further cross-examination outside of the jury's presence, counsel never proposed this course of action. We believe that the court acted within its discretion in refusing to allow further cross-examination of Frazier, after the close of evidence, based solely on Breeden's proffered belief that a plea agreement existed. This is particularly true in light of the prosecutor's specific representation to the court that there was no agreement with Frazier.

■ Finally, even if we were to assume that the court did improperly restrict Williams' right to cross-examination, we believe that in this case, any such error was harmless beyond a reasonable doubt. Williams argues that improper restrictions on the right to cross-examination can never be treated as harmless error; however, since the briefs in this case were filed, the United States Supreme Court held in *Delaware v. Van Arsdall*, ____ U.S. ____, 106 S. Ct. 1431 (1986), that "[t]he constitutionally improper denial of a defendant's opportunity to impeach a witness for bias, like other Confrontation Clause errors, is subject to . . . harmless-error analysis." *Id.* at ____, 106 S. Ct. at 1438. [3] Under the Court's reasoning, "the correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." *Id.*

Factors cited by the Court as important to the harmless error inquiry are "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence

---

[3] The Supreme Court of Virginia reached a similar conclusion in *Shanklin v. Commonwealth,* 222 Va. 862, 864-65, 284 S.E.2d 611, 612-13 (1981).

or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted and, of course, the overall strength of the prosecution's case." *Id.*

In the present case, the Commonwealth's overall case was strong. Frazier's testimony was not unimportant; however, there was a good deal of evidence which tended to corroborate it and no evidence to refute it. Williams' own admissions to Detective Tamez provided strong support for Frazier's testimony. Additional support was provided by facts established independently of Frazier's testimony, such as the cocaine found in Williams' briefcase and the eleven hundred dollars found in his pocket.

The only evidence attacking Frazier's credibility came from his sister, Mary Breeden, who had been dating Williams. Breeden testified on Williams' behalf that Frazier came to her house in January of 1984 and attempted to buy cocaine from Williams. This evidence did nothing to impeach material portions of Frazier's testimony since he admitted to having used cocaine during January of 1984. He denied selling any cocaine; Breeden's testimony did not contradict this. Her testimony was only that Frazier sought to purchase cocaine and that the person he sought to purchase it from was Williams. Thus, we find that Breeden's testimony did as much to support Frazier's testimony regarding Williams' involvement with drug sales as it did to weaken Frazier's credibility.

Finally, Williams was not deprived of all right to cross-examine Frazier. Defense counsel cross-examined Frazier during the trial and confirmed the fact that drug charges against him were still pending. Even without the further cross-examination sought, counsel was able to argue to the jury that Frazier should not be believed because he was attempting to "save his own skin" and that he was "motivated to put the blame on someone else." Counsel also invited the jury to "wonder how the Commonwealth got Stephen Frazier to come to court and testify [since] [h]is case hasn't come up yet." It is evident from these facts that Williams was not deprived of the opportunity to argue that Frazier had a motive to provide favorable testimony for the Commonwealth.

Our review of the total record convinces us beyond a reasonable doubt that even if Frazier had been recalled for further cross-examination and had revealed that he had worked out a plea agree-

ment with the Commonwealth, the jury would not have reached a different verdict. Any error in refusing to allow further cross-examination was therefore harmless.

## VII. *CLOSING ARGUMENT OF PROSECUTOR*

 Williams argues that the prosecutor improperly commented on his failure to testify by asking the jury on rebuttal, "Where's the evidence that he [Williams] isn't guilty?" The Commonwealth argues that this was a proper response to Williams' closing argument in which counsel asked the jury, "[W]here is the evidence that Robert Williams possessed any cocaine or other controlled substance, and where is the evidence that he was planning to or attempting to distribute or sell cocaine to anyone else?"

The Supreme Court has stated:

In determining whether a remark falls within the boundary of the prohibition that a prosecutor shall not make an adverse comment before the jury on a defendant's failure to testify, the test is whether, in the circumstances of the particular case, "the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify".

*Hines v. Commonwealth*, 217 Va. 905, 907, 234 S.E.2d 262, 263 (1977) (quoting *Knowles v. United States*, 224 F.2d 168, 170 (10th Cir. 1955)).

The present case is very much like the situation presented in *Hines*. There, the defendant was arrested with a large sum of money in his possession and the Commonwealth attempted to show at trial that the money was connected to Hines' drug activities. During closing argument, the prosecutor commented on the lack of evidence explaining Hines' possession of so much cash. The trial court overruled Hines' objection to this argument and the Supreme Court affirmed, stating: "It was obviously the theory of the Commonwealth that this money was obtained in the course of defendant's illegal trafficking in drugs. The purpose of the prosecutor's argument was to direct the jury's attention to the fact that there was no other explanation for defendant's possession of such a sum. The trial judge correctly concluded that this argu-

ment was not a comment upon defendant's failure to testify." *Hines*, 217 Va. at 907, 234 S.E.2d at 263-64.

We find that the remarks of the prosecutor in the present case did not amount to an adverse comment on Williams' failure to testify. The prosecutor was only taking defense counsel's tactic of asking: "Where is the evidence?" and turning it around. It was more of an exercise in rhetoric than anything else. Under the circumstances, we cannot say that it was manifestly intended to be a comment on Williams' failure to testify or that the jury would have naturally and necessarily taken it to be such a comment.

## VIII. *SUFFICIENCY OF THE EVIDENCE*

 Williams' final argument is that the evidence was insufficient as a matter of law to convict him of possessing cocaine with intent to distribute. The rule in Virginia is as follows:

> To support a conviction based upon constructive possession, "the Commonwealth must point to evidence of acts, statements, or conduct of the accused or other facts or circumstances which tend to show that the defendant was aware of both the presence and character of the substance and that it was subject to his dominion and control."

*Drew v. Commonwealth*, 230 Va. 471, 473, 338 S.E.2d 844, 845 (1986) (quoting *Powers v. Commonwealth*, 227 Va. 474, 476, 316 S.E.2d 739, 740 (1984)); *Behrens v. Commonwealth*, 3 Va. App. 131, 135, 348 S.E.2d 430, 432 (1986).

The cocaine which formed the basis of this prosecution was found in a briefcase which was identified by Frazier as being "very much like" one that Williams had recently purchased. More importantly, the briefcase contained Williams' resume. Further, Williams made incriminating statements to Detective Tamez regarding his possession and intent to distribute cocaine. We find, therefore, that the evidence was more than sufficient to convict Williams of possessing cocaine with intent to distribute.

For the reason stated above, we find that Williams has failed to establish any constitutional deprivation or reversible error. Accordingly, the judgment of the trial court will be affirmed.

*Affirmed.*

Baker, J., and Coleman, J., concurred.