COURT OF APPEALS OF VIRGINIA

Present: Judges Humphreys, Kelsey and Senior Judge Overton
Argued at Chesapeake, Virginia


CHERYL KASHAWN JONES

                                                        OPINION BY
v.      Record No. 2200-04-1                      JUDGE ROBERT J. HUMPHREYS
                                                        NOVEMBER 8, 2005

COMMONWEALTH OF VIRGINIA


                    FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
                              Charles D. Griffith, Jr., Judge

            B. Thomas Reed for appellant.

            Virginia B. Theisen, Assistant Attorney General (Judith Williams
            Jagdmann, Attorney General, on brief), for appellee.


        Cheryl Kashawn Jones (appellant) appeals her conviction, following a bench trial, of

felonious child neglect, in violation of Code § 18.2-371.1(B)(1). On appeal, she contends the

evidence was insufficient to prove she willfully failed to provide care for her child in a manner

so gross, wanton, and culpable as to show a reckless disregard for his life. We disagree and

affirm.

                                        BACKGROUND

        When considering the sufficiency of the evidence on appeal of a criminal conviction, we

view the evidence "in the light most favorable to the Commonwealth and grant all reasonable

inferences fairly deducible therefrom." Ellis v. Commonwealth, 29 Va. App. 548, 551, 513

S.E.2d 453, 454 (1999).

        So viewed, the evidence established that, as of October 23, 2003, appellant had one

eight-year-old child. On October 23, 2003, fifteen City of Norfolk police officers, dressed in

body armor and ballistic helmets, executed a search warrant[1] at appellant's apartment.[2]  During the week prior to execution of this warrant, officers conducted surveillance on appellant's apartment, and they noticed heavy foot traffic going to and from the residence.  The officers consummated an undercover purchase of narcotics at the apartment, and informants indicated that lookouts were stationed both day and night inside the hallways leading to the apartment.  The informants also told the officers the occupants might be armed.

As the officers made their way to the apartment to execute the warrant, appellant's brother exited the apartment and then attempted to reenter it.  Officer Currot, the lead detective, pushed appellant's brother to the ground and entered the apartment.  The officers were equipped with a steel ram to open the door, and they entered the apartment with weapons drawn.  The weapons included submachine guns, .45 caliber handguns, and 9-millimeter handguns.

Upon entry, the officers observed appellant, her sister, and her sister's boyfriend in the living room.  Currot entered the first bedroom on the left and saw appellant's son on the bed doing his homework.  The child's head was at the foot of the bed, and his feet were by a nightstand at the head of the bed.  On the nightstand, Currot found a medicine bottle containing fourteen capsules of heroin.  Under the mattress below the child's head, Currot found a dinner plate dusted with cocaine residue.  There were also packaging materials with the plate.  In the next room, Currot found seven other unattended children ranging in age from infancy to seven or eight years old.

---

[1] The record refers to the warrant as a "no-knock, level three search warrant."  The record does not reflect what is meant by such a description of the search warrant; however, it is evident that the decision was made to effectuate a "no-knock" entry to execute the warrant.  In any event, the propriety of the warrant and the manner of its execution are not at issue in this case.

[2] As indicated by Officer Currot, the officers executed a no-knock entry because they perceived a higher threat of harm as they expected the occupants to be armed.

On July 27, 2004, appellant was convicted of one count of felony child neglect. In convicting appellant of the charged offense, the trial court noted the following:

> Given the evidence of what the behavior was and the actions that were going on inside of the residence just moments prior to and at the time of the execution of the warrant, that is always part and parcel of the drug trade. There's evidence that there were guards outside . . . [t]here was foot traffic . . . for the week prior . . . . The child was in proximity to a container of 14 capsules of heroin in excess of a gram, 1.015 grams . . . . And although you make a point about a childproof container, this is an eight-year old child. This is not a baby whose motor skills have not developed yet . . . . And the mother's statement admits she's selling some 20 capsules a day for the last three months out of the apartment. The fact that this was there . . . is further evidence of an ongoing activity on her part. So she's placed him in a position where he has direct, personal access to a drug that can cause death if overdosed . . . . [S]he's placed her child in a position where he's likely or reasonably likely to perhaps take the drug by accident and unwittingly and seriously injure himself or kill himself. Then on top of that, she's engaged in an activity that creates a high risk of violence . . . . [W]hen a large team of narcotics investigators armed with a no-knock search warrant goes into an apartment in heavy body armor and armed with their weapons drawn, anything can happen . . . . [T]hose are the things that the mother fails to account for by engaging in this high risk, dangerous activity with her son right there in the middle of it all.

This appeal followed.

ANALYSIS

On appeal, appellant contends that her conviction for felony child neglect should be reversed because her conduct was insufficient to demonstrate a gross, wanton, and willful disregard for human life. For the reasons that follow, we disagree and, therefore, affirm.

When the sufficiency of the evidence is challenged on appeal, the judgment of the trial court will not be set aside unless it appears from the evidence that the judgment is "plainly wrong or without evidence to support it." Martin v. Commonwealth, 4 Va. App. 438, 443, 358 S.E.2d 415, 418 (1987). Also, "[g]reat deference must be given to the fact finder who, having

- 3 -

seen and heard the witnesses, assesses their credibility and weighs their testimony." Walton v. Commonwealth, 255 Va. 422, 426, 497 S.E.2d 869, 871 (1998).

Appellant was convicted of violating Code § 18.2-371.1(B)(1), which provides in relevant part as follows:

> Any parent, guardian or other person responsible for the care of a child under the age of 18 whose willful act or omission in the care of such child was so gross, wanton and culpable as to show a reckless disregard for human life shall be guilty of a Class 6 felony.

Thus, to support a conviction for felony child neglect, the Commonwealth must establish that the defendant, through her willful act or omission, created a situation placing the child at risk of actual physical harm. Barrett v. Commonwealth, 268 Va. 170, 183, 597 S.E.2d 104, 110 (2004).

Unlike Code § 18.2-371.1(A) which prohibits "any parent, guardian, or other person responsible for the care of a child" from willfully permitting "any injury to the life or health of such child," subsection (B)(1) of the statute "does not require that a child actually suffer serious injury as a result of the defendant's acts or omission." Commonwealth v. Duncan, 267 Va. 377, 385, 593 S.E.2d 210, 214 (2004). The structure of subsection (B)(1), in particular, the absence of any injury requirement and the authorization of a less severe punishment, "demonstrates a legislative intent to prohibit conduct that also has the *potential* for endangering a child's life." Id. (emphasis added). Thus, as Duncan instructs, the statutory element of "'reckless disregard [for human life]' can be shown by conduct that subjects a child to a substantial risk of serious injury, as well as to the risk of death, because exposure to either type of risk can endanger the child's life." Id.

The sole issue on appeal in this case is whether the mother's conduct created a probability of serious bodily injury or death sufficient to bring that conduct within the scope of

- 4 -

Code § 18.2-371.1(B)(1). We hold appellant's conduct did subject her child to a substantial risk of serious bodily injury or death, and we affirm her conviction.

A.

Initially, to be convicted under Code § 18.2-371.1(B)(1), an individual must engage in a "willful act or omission in the care of [a] child [that is] so gross, wanton and culpable as to show a reckless disregard for human life." In the present case, the record reflects appellant willfully engaged in selling heroin from her apartment. Appellant stated that, for three months prior to the execution of the search warrant, she had been selling approximately 20 capsules of heroin a day. Upon execution of the warrant, police found a medicine bottle containing fourteen capsules of heroin on a nightstand near appellant's child.

It is this drug activity, both the sale of drugs from the apartment and the presence of a controlled substance in close proximity to the child, that constitutes the willful act required by the statute. Appellant does not contest she engaged in such conduct, but rather argues that such conduct was insufficient to pose a substantial or probable likelihood of serious bodily injury or death to the child.

B.

First, appellant contends armed entry by police officers merely *could* have resulted in injury and, therefore, did not create the requisite "probability" of harm contemplated by Code § 18.2-371.1(B)(1). We disagree.

As we observed in Williams v. Commonwealth, 4 Va. App. 53, 354 S.E.2d 79 (1987),

> Although suspicion of narcotics possession and distribution is not universally recognized as a circumstance which, standing alone, gives rise to an inference of dangerousness, we believe that the better view is that it does. The Supreme Court implied as much in Summers when it stated: "[T]he execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence."

- 5 -

Id. at 67, 354 S.E.2d at 87 (quoting Michigan v. Summers, 452 U.S. 692, 702 (1981)) (citation omitted).

In Williams, police officers obtained a search warrant for a home believed to contain cocaine. Id. at 59, 354 S.E.2d at 82. However, before the officers could execute the warrant, Williams, the individual suspected of dealing cocaine, left the home in his vehicle. Id. An officer conducting surveillance of the residence notified the officer who was en route to execute the warrant that Williams had left the home. The officers decided to follow Williams and pull him over. When Williams exited the vehicle, the officers conducted a pat-down search for weapons. Id. Williams contested the validity of the pat-down search.[3] Id. at 66, 354 S.E.2d at 86. In deciding the pat-down search was not in violation of Williams's Fourth Amendment rights, this Court recognized that, because the officers knew Williams was presently engaged in narcotics distribution, they were entitled to conduct a protective pat-down search. Id. at 66, 354 S.E.2d at 87. This Court stated "[t]o hold otherwise would be an invitation to violence in what is always a potentially explosive situation." Id.

The facts and circumstances of the present case clearly illustrate the recognized connection between violence and drugs. Further, this case presents a situation in which the ongoing potential for violence stemming from the illegal sale of drugs continually put a child in harm's way.

The record indicates that, based on the prior week's surveillance that suggested substantial drug trafficking, police officers entered appellant's home pursuant to a search warrant, wearing body armor with their weapons drawn. Although no weapons were actually found in the apartment, the officers, believing the occupants to be armed, executed a no-knock

---

[3] This was not the only issue on appeal; however, it is the only relevant issue with regard to the relationship between drugs and violence.

entry and conducted themselves in a precautionary manner. Based on the information received from the informants, and the nature of the drug trade, the potential for violence was present and caused by the appellant's own actions.

Appellant argues that, because the officers did not observe any firearm activity in the week before the raid and did not find any firearms in the apartment, the type of violent resistance contemplated in Williams and Summers was far from probable. We disagree.

Appellant engaged in the illegal sale of narcotics from her home. Based on their ongoing investigation, the officers executing the warrant believed the occupants might be armed. This caused the officers to enter with protective armor and weapons drawn. As indicated by Currot's testimony, this type of situation inherently poses a risk of substantial bodily harm or death, even to children and other innocent bystanders.[4] Officer training aside, the appellant's willful conduct led the officers to believe that violence may have resulted upon execution of the warrant. The mere presence of armed officers created a situation fraught with the potential for violence. Thus, a reasonable fact finder could infer that, when armed officers entered appellant's apartment, the potential for harm to her child escalated. A reasonable fact finder could also conclude this particular harm posed a substantial or probable likelihood of serious bodily harm or death as required by Code § 18.2-371.1(B)(1).

---

[4] Currot testified to the type of potential danger to innocent children bystanders that could arise in situations such as the one before this Court. When asked by defense counsel if he felt threatened by the child on the bed, Currot responded "No, sir." However, he qualified this response by stating he once almost shot a child in the dark after mistaking the child for an animal. In that situation, Currot had also entered the residence with his weapon drawn. Although it was not dark at the time Currot executed the warrant, he acknowledged the potential for serious bodily harm or death to innocent children during a police raid.

C.

Appellant also contends that merely placing a child in a position where he is *reasonably likely* to ingest illegal drugs does not give rise to a probability of harm contemplated by Code § 18.2-371.1(B)(1). Again, we disagree.

Although this Court has never addressed whether a child's mere proximity to illegal narcotics creates a substantial risk of bodily harm, we hold that, under the circumstances of this case, a reasonable fact finder could have concluded that the child was at risk of ingesting the illegal narcotics and incurring substantial bodily harm as a result. Other states, which have addressed this question in the context of similar statutes, have reached the same conclusion. For example, in State v. Padua, 869 A.2d 192 (Conn. 2004), the Supreme Court of Connecticut affirmed the convictions of three defendants who kept marijuana in close proximity to two children, ages seven and three.[5] These convictions stemmed from evidence found when police officers executed a search warrant on the defendants' home. Id. at 199. Upon entry, the officers found marijuana on the kitchen table being packaged for sale. Id. They also found large amounts of marijuana in different locations throughout the house. Id.

The appellants in that case argued the mere presence of marijuana was not sufficient to justify a conviction under the statute. The Connecticut Supreme Court disagreed. In affirming the convictions, the Padua court noted that "[t]he ability to draw inferences about the impairing effects of marijuana, like alcohol, . . . is based upon common knowledge, experience and common sense." Id. at 203. The court further stated that, although the precise physiological effects of marijuana and their severity may not be within common knowledge, the only question the jury must answer is whether the ingestion, oral or otherwise, of marijuana would be likely to

---

[5] The three defendants were the children's parents and their grandmother. All were charged with two counts of risk of injury to a child.

injure the child. Id. at 207. Under the circumstances of that case, the Padua court concluded that the mere presence of marijuana was sufficient to create a likelihood of injury to the child. See id.

In this present case, appellant stated she had been selling 20 capsules of heroin a day from her apartment since July 2003. When the officers executed the search warrant, appellant's child was within an arm's reach of fourteen capsules of heroin. Also, a plate containing cocaine residue and plastic bags for packaging were located under the mattress where he lay.

As in Padua, the illegal substance was within arm's reach of appellant's child. There is no evidence to suggest appellant took any precautions to eliminate the possibility of her child opening the container and ingesting the heroin.[6] As stated in Duncan, "based on the evidence presented, the dangers inherent in such a situation could be inferred by the fact finder as a matter of common knowledge." Duncan, 267 Va. at 386, 593 S.E.2d at 215. Thus, we find that a reasonable fact finder could infer, based on common knowledge, that there are inherent dangers in placing any amount of an illegal substance such as heroin within reach of a child.

CONCLUSION

By engaging in the sale of drugs from her home, appellant willfully placed her child in harm's way. She exposed her child to the risk of an accidental overdose. Her child and other children were also placed in the midst of a potentially violent situation when police officers entered appellant's apartment while executing the search warrant. This type of inherently dangerous situation clearly poses a substantial risk of serious bodily injury or harm to the child

---

[6] At oral argument, appellant's counsel suggested that the childproof container would have prevented appellant's son from opening the bottle and ingesting the drugs. He commented further that there was no evidence in the record to suggest her son could have opened the childproof medicine bottle containing the heroin. However, as noted by the trial court, although the heroin was in a childproof container, the child was not a baby whose motor skills had not developed. And, as the Commonwealth asserts, there is no evidence that appellant's son, who was eight years old at the time and able to read and write, would be unable to follow the instructions, "push down and turn to open," that were printed on the bottle cap.

and is within the parameters the legislature contemplated when drafting Code

§ 18.2-371.1(B)(1).  We hold, therefore, that the evidence was sufficient to prove beyond a

reasonable doubt that the trial court did not err in concluding that appellant's conduct "was so

gross, wanton and culpable as to show a reckless disregard for human life."  Code

§ 18.2-371.1(B)(1).

For these reasons, we affirm appellant's conviction.

Affirmed.