COURT OF APPEALS OF VIRGINIA

Present: Chief Judge Fitzpatrick, Judges Frank and Clements
Argued at Alexandria, Virginia


LUIS ALBERTO NAVARRETTE

v.    Record No. 0403-01-4

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*] BY
JUDGE JEAN HARRISON CLEMENTS
OCTOBER 8, 2002

FROM THE CIRCUIT COURT OF ARLINGTON COUNTY
Paul F. Sheridan, Judge

Gary H. Smith for appellant.

Jennifer R. Franklin, Assistant Attorney
General (Randolph A. Beales, Attorney
General, on brief), for appellee.


Luis Alberto Navarrette was convicted in a jury trial of three counts of rape of a child under the age of thirteen, in violation of Code § 18.2-61. On appeal, he contends (1) the trial court erred in denying his motion to suppress the inculpatory statements he involuntarily made to police during a custodial interrogation that violated his constitutional rights and (2) the Commonwealth's evidence was insufficient as a matter of law to sustain his convictions. Finding no error, we affirm Navarrette's convictions.

As the parties are fully conversant with the record in this case and because this memorandum opinion carries no precedential

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

value, this opinion recites only those facts and other incidents of the proceedings as necessary to the parties' understanding of the disposition of this appeal.

## I. MOTION TO SUPPRESS

On appeal from a trial court's denial of a motion to suppress, the burden is on the appellant to show that the denial of the motion constituted reversible error.  See Fore v. Commonwealth, 220 Va. 1007, 1010, 265 S.E.2d 729, 731 (1980).  In reviewing such a denial, we consider the evidence in the light most favorable to the Commonwealth, granting to the Commonwealth all reasonable inferences fairly deducible from the evidence.  E.g., Commonwealth v. Grimstead, 12 Va. App. 1066, 1067, 407 S.E.2d 47, 48 (1991).

Viewed in the light most favorable to the Commonwealth, the pertinent evidence presented in this case established that, on March 2, 2000, Kaiser Permanente informed the Arlington County Police Department that M.N., an eleven-year-old patient of theirs, was pregnant.  During an interview with the police that same day, M.N. reported that Navarrette, her uncle, who lived with her family, had had sexual intercourse with her.

That same day, two detectives in plain clothes and a Spanish-speaking uniformed officer, Isaac Ruiz, went to Navarrette's apartment around 11:30 p.m.  The officers knocked on the front door of the apartment.  When M.N.'s father opened the door, Ruiz told him that they were there about his daughter's case

-

and wanted to speak to Navarrette.  The father let the officers in, telling them his brother, Navarrette, was asleep in the bedroom.  Accompanied by Ruiz, the father knocked on the bedroom door, opened it, and pointed out Navarrette.

Not turning on the lights in the room because other people were asleep in the room, Ruiz saw Navarrette sitting on the bed. As a precaution, Ruiz scanned the room with his flashlight but saw nothing of concern.  Identifying himself as a police officer, Ruiz informed Navarrette he was there in reference to M.N.'s case and asked him to get dressed and come into the other room.

Although initially groggy, Navarrette quickly woke up and was responsive.  He got dressed, came out of the bedroom, and sat at the kitchen table next to M.N.'s father.  With Ruiz translating, the detectives told Navarrette they were there about M.N.'s case and asked if he minded coming to the police station with them to answer some questions.  Navarrette replied, "No problem."  Ruiz told Navarrette he was not under arrest.  He was not handcuffed. Ruiz testified that the demeanor of the officers in the apartment was "passive" throughout their encounter with Navarrette.  They never, Ruiz testified, raised their voices in speaking to Navarrette.

Before leaving, Navarrette went back to the bedroom to get his wallet.  Ruiz accompanied him and used his flashlight to assist him in finding his wallet.

Leaving the apartment, Navarrette walked "causally" with the officers to Ruiz's marked police cruiser.  When Ruiz unlocked the car, Navarrette opened the rear door himself and got in.  The car had no "cage," the doors were unlocked, and the interior door handles were operational.  One of the detectives sat up front with Ruiz, who drove.  M.N.'s father rode to the police station with the other detective.  The drive to the police station took five minutes.  M.N.'s father testified that, before they left for the police station, the officers told Navarrette and him, "[W]e'll bring you back," which he understood to mean that they would bring both of them back to the apartment following the questioning at the police station.

At the police station, Officer Ruiz escorted Navarrette to the interview room on the eighth floor.  Arriving at the room, Ruiz showed Navarrette where to sit and offered to get him a Coke to drink.  Navarrette initially declined the offer but accepted when Ruiz again offered to get him a drink five minutes later.  Later, while they awaited the arrival of the investigating detective, Ruiz showed Navarrette to the bathroom.  Ruiz waited for Navarrette outside the bathroom in the hall because a "pass card" was needed to get back into the interview room area.  Navarrette "seemed a little tired" to Ruiz, but he had no problems communicating and was responsive to the questions asked.

At approximately 1:45 a.m., Detective Skeens, who was in plain clothes, arrived at the interview room.  Navarrette had his

-

head resting on his hands when Skeens and Ruiz first entered the interview room, but looked up as they came in.  According to Skeens, Navarrette "seemed to be alert" and was "pretty responsive."  Neither officer had a weapon.  The door remained open during the interview, and Navarrette was not handcuffed.

Skeens, who spoke only English, asked Navarrette if he would answer some questions, and Navarrette, who appeared "really awake" to Ruiz, agreed to speak with him.  Skeens explained to Navarrette that there were allegations that Navarrette had engaged in sexual intercourse with his eleven-year-old niece.  Skeens further informed Navarrette that he was not under arrest, that he did not have to talk to the police, and that arrangements would be made to get him a ride home if he wanted to leave.

According to Ruiz, Navarrette began the interview speaking to Skeens in English.  Later, Ruiz testified, Navarrette would sometimes respond immediately in Spanish to Skeens' question without needing Ruiz to translate the question.  Ruiz would then translate Navarrette's response into English for Skeens.  Other times, Navarrette would immediately restate Skeens' question in Spanish to Ruiz, who would confirm that it was the correct question.  Navarrette would then respond to the question in English or Spanish.  Ruiz testified he had no trouble speaking with Navarrette or understanding what he was saying.

Navarrette initially denied the allegations that he had had sexual relations with his niece, saying "he would have to be some

-

kind of animal to do that."  However, when Skeens informed Navarrette that his niece was pregnant and suggested Navarrette may have been forced to do things against his will by her, Navarrette admitted he had had sexual intercourse with her at least ten different times, stating it was her fault for flirting with him.  After confirming with Navarrette that the admitted acts indeed constituted sexual intercourse, Skeens placed him under arrest.  Skeens then had Ruiz read Navarrette a <u>Miranda</u> rights form in Spanish, which Navarrette signed at 3:05 a.m.

During the interview, Navarrette never stated he wanted to leave or stop answering questions.  He never asked to speak to his brother.  Skeens and Ruiz both testified the officers did not bang on the table, raise their voices to Navarrette, become angry with him, or threaten him during the interview.

Testifying at the suppression hearing, Navarrette denied he ever had sex with his niece.  He testified he repeatedly told the police during the interrogation he did not have sexual intercourse with M.N.  He further testified, however, that, after Skeens became upset, banged on the table, and demanded the truth, he told the police he had had sexual intercourse with M.N. in the hope he would be released.  Acknowledging neither officer at the interview told him he would be released if he admitted he had had sexual intercourse with his niece, he was, he testified, tired at the time and thought he would be let go if he said he had done so.  He was tired, he stated, because he had gotten up on March 2, 2001,

-

at 4:00 a.m., worked nine hours at his construction job pouring concrete for house foundations, driven his girlfriend to her job where he helped her clean an office building until 9:30 p.m., and gone to bed at 10:30 p.m., before being woken by the police a short time later.

Dr. Gloria Morote, a neuro-psychologist, testified she determined from testing that Navarrette was in the mentally deficient range for verbal intelligence and in the low average range for nonverbal intelligence. Such a deviation in the two intelligence ranges, Morote testified, was characteristic of someone with a "language-related processing disorder[]." Such a disorder, Morote explained, would cause one to have problems receiving and processing information and communicating clearly. Based on the results of a test for malingering, Dr. Morote concluded that Navarrette did not purposefully score low on the verbal intelligence test. Based on the results of a test administered to Navarrette's sister to measure Navarrette's compliance in the presence of authority figures, Morote concluded that Navarrette was "more compliant than ninety-five percent of the population," meaning he would be likely to "give in or to cave under pressure, . . . or to just not stand up for himself."

Dr. Morote further testified she performed a "thorough" history of Navarrette's educational background. According to her testimony, however, Navarrette told her he attended school from the age of five until he was sixteen, but only completed sixth

-

grade because he repeated first grade.  Timewise, Morote testified, this "didn't . . . make sense," but she offered no explanation.

### A.  Voluntariness of Confession

Navarrette contends that his admission to the police that he had sexual intercourse with his niece was not made voluntarily. Specifically, he argues that, given his low intelligence, his language-related processing disorder, his inordinate propensity to comply with authority figures, and his extreme state of fatigue at the time of the interrogation, his will was overborne when the police woke him in the middle of the night, took him to the police station, and interrogated him for nearly three hours, at times banging on the table and demanding the truth while confronting him with accusations that he raped his niece.  Having initially denied having had sexual intercourse with his niece, Navarrette eventually told the police he did, he asserts, as a result of his confusion and stress, in the hope that he would be released. Thus, Navarrette concludes, his inculpatory statements were not voluntary and the trial court erred in denying his motion to suppress them.

"The Commonwealth has the burden to prove, by a preponderance of the evidence, that a defendant's confession was freely and voluntarily given."  Bottenfield v. Commonwealth, 25 Va. App. 316, 323, 487 S.E.2d 883, 886 (1997).  The issue of voluntariness is a question of law requiring an independent determination on appeal.

-

E.g., Wilson v. Commonwealth, 13 Va. App. 549, 551, 413 S.E.2d 655, 656 (1992).  However, in making that independent determination, "we are bound by the trial court's subsidiary factual findings unless those findings are plainly wrong."  Id.

"In assessing voluntariness, [we] must determine whether 'the statement is the "product of an essentially free and unconstrained choice by its maker," or . . . whether the maker's will "has been overborne and his capacity for self-determination critically impaired."'"  Roberts v. Commonwealth, 18 Va. App. 554, 557, 445 S.E.2d 709, 711 (1994) (quoting Stockton v. Commonwealth, 227 Va. 124, 140, 314 S.E.2d 371, 381 (1984) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973))).  To make that determination, we must look to the "'totality of all the surrounding circumstances,'" Commonwealth v. Peterson, 15 Va. App. 486, 488, 424 S.E.2d 722, 723 (1992) (quoting Gray v. Commonwealth, 233 Va. 313, 324, 356 S.E.2d 157, 163 (1987)), including "the defendant's age, intelligence, mental and physical condition, background and experience with the criminal justice system, the conduct of the police, and the circumstances of the interview."  Bottenfield, 25 Va. App. at 323, 487 S.E.2d at 886. While the "mental condition of the defendant is 'surely relevant to [his] susceptibility to police coercion[,]' . . . evidence of coercive police activity 'is a necessary predicate to the finding that a confession is not "voluntary."'"  Peterson, 15 Va. App. at 488, 424 S.E.2d at 723 (quoting Colorado v. Connelly, 479 U.S.

-

157, 167 (1986)). In other words, "some level of coercive police activity must occur before a statement or confession can be said to be involuntary." Id. Furthermore, the police misconduct must be "'causally related to the confession.'" Williams v. Commonwealth, 4 Va. App. 53, 73, 354 S.E.2d 79, 90 (1987) (emphasis omitted) (quoting Connelly, 479 U.S. at 164). In considering the conduct of the police, we "must consider the interrogation techniques employed, including evidence of trickery and deceit, psychological pressure, threats or promises of leniency, and duration and circumstances of the interrogation." Terrell v. Commonwealth, 12 Va. App. 285, 291, 403 S.E.2d 387, 390 (1991).

We are further mindful, in assessing whether Navarrette's inculpatory statements were voluntarily made, that "[c]onflicts in evidence present factual questions that are to be resolved by the trial court," which "'must evaluate the credibility of the witnesses, resolve the conflicts in their testimony and weigh the evidence as a whole.'" Mills v. Commonwealth, 14 Va. App. 459, 468, 418 S.E.2d 718, 723 (1992) (quoting Albert v. Commonwealth, 2 Va. App. 734, 738, 347 S.E.2d 534, 536 (1986)). The trier of fact is not required to accept a party's evidence in its entirety, but is free to believe or disbelieve in part or in whole the testimony of any witness. Rollison v. Commonwealth, 11 Va. App. 537, 547, 399 S.E.2d 823, 830 (1991).

-

Here, the trial judge rejected Dr. Morote's testimony regarding Navarrette's intelligence and cognitive abilities, finding the "premise of [her] factual collection of information . . . inconsistent with the facts" of the case.  In reaching that decision, the trial judge found:

> Officer Ruiz spent time with this man, heard him speak in English, heard him mentally work out what was being said to him, had him translate the English question accurately to Spanish, turn to Ruiz and go back to the English-speaking questioner.  His cognitive ability, his language skills, his responsiveness, his state-of-mind, Ruiz is the one who is very important in that decision.

> *       *       *       *       *       *       *

> The expert is very qualified and very persuasive and very helpful to the Court, but the facts upon which she relies are not facts that appear persuasive to this Court.

> *       *       *       *       *       *       *

> I'm not persuaded these I.Q. numbers are right.

> *       *       *       *       *       *       *

> I had the opportunity to witness this man and listen to him, watch him.  He is – I mean in fifteen years of watching criminal defendants under the pressure of litigation, indictment and courtroom proceedings, he is certainly not in the bottom in terms of intelligence, verbal and otherwise.

> *       *       *       *       *       *       *

> His communication skills are right – there is no way he is retarded.

> *       *       *       *       *       *       *

-

[H]e persuades me both by demeanor and responsiveness and apparent intelligence today, that he does have the capacity to make reasonable choices and voluntary choices, and have a free will in what he chooses to do or what he chooses not to do.

These subsidiary factual findings by the trial court are supported by credible evidence in the record and are not plainly wrong. As noted by the trial judge, Officer Ruiz's testimony regarding Navarrette's capacity to correctly translate Skeens' questions into Spanish before Ruiz translated them evinces Navarrette's ability to effectively process language and communicate. Moreover, the transcript of Navarrette's testimony at the suppression hearing clearly does not reflect the declarations of a person with a low level of intelligence, a language-related processing disorder, or a problem with excessive compliance. To the contrary, Navarrette's answers to the questions asked during direct and cross-examination, as translated into English by the in-court interpreter, were consistently articulate, responsive, precise, and given without apparent hesitation or confusion. Additionally, several times during cross-examination and questioning by the trial judge, Navarrette unwaveringly denied having done the act addressed in the question. Accordingly, because it is supported by credible evidence and not plainly wrong, we are bound by the trial court's factual finding that Navarrette's intelligence and mental condition did not impair his capacity for self-determination.

As to Navarrette's claim that his extreme state of fatigue at the time of the interview rendered his inculpatory statements involuntary, our review of the record convinces us that this contention is also without merit. While Navarrette was plainly awakened in the middle of the night from a short sleep after a long workday,[1] no evidence shows that his capacity for self-determination was impaired by fatigue. He was groggy at his apartment when he first awoke, but he quickly became alert. At the police station, he appeared to be "a little tired" to Ruiz, but he was alert and responsive. Although he was at the police station for nearly two hours before Detective Skeens arrived for the interview, the interview itself lasted only a little over an hour. There was no indication that he was falling asleep during the interview or that he was disoriented or confused. According to Ruiz, he was "really awake" during the interview. To Skeens, he "seemed alert" and "responsive."

Moreover, viewed in the light most favorable to the Commonwealth, the evidence does not establish any coercive police misconduct. There is no evidence that the police used trickery or deceit, psychological pressure, or threats or promises of leniency to elicit Navarrette's confession. According to Skeens and Ruiz, neither officer raised his voice during the interview, got angry, banged on the table, or threatened Navarrette. Furthermore,

---

[1] Nothing in the record indicates the police knew of Navarrette's long workday.

Skeens told Navarrette he was not under arrest, did not have to speak with the police, and would be given a ride home if he wanted to leave.

Additionally, Navarrette is an adult. He attended school until he was sixteen years old, regularly drove a car, and had a job.

Considering the totality of all the surrounding circumstances, we conclude, as did the trial court, that Navarrette's will was not overborne, his capacity for self-determination was not critically impaired, and his confession was the product of an essentially free and unconstrained choice. Accordingly, we hold that Navarrette's admission to the police that he had engaged in sexual intercourse with M.N. was freely and voluntarily given.

## B. Custodial Status

Navarrette also contends his confession was given during a custodial interrogation conducted by the police. Although not arrested at the time of his confession, Navarrette argues that, based on the totality of the circumstances surrounding his confession, a reasonable person in his shoes would have understood that he was not free to ignore the officers' requests to answer questions or to leave the police station. Therefore, he argues, he was entitled to Miranda warnings before he made the inculpatory statements, and the failure of the police to give such warnings

-

prior to his inculpatory statements required suppression of his

confession.  We disagree.

A person who "has been taken into custody or otherwise

deprived of his freedom of action in any significant way" is

entitled to be given Miranda warnings before being questioned by

police.  Miranda v. Arizona, 384 U.S. 436, 444 (1966).  Miranda

applies when a person has been deprived of his freedom of action

to the "degree associated with a formal arrest."  California v.

Beheler, 463 U.S. 1121, 1125 (1983) (per curiam).  To make this

determination, "the only relevant inquiry is how a reasonable man

in the suspect's shoes would have understood the situation."

Berkemer v. McCarty, 468 U.S. 420, 442 (1984).  "The totality of

circumstances must be considered in determining whether the

suspect is in custody when questioned . . . ."  Wass v.

Commonwealth, 5 Va. App. 27, 32, 359 S.E.2d 836, 839 (1987).

> The circumstances may include factors such as
> the familiarity or neutrality of the
> surroundings, the number of officers present,
> the degree of physical restraint, the
> duration and character of the interrogation,
> the presence of probable cause to arrest, and
> whether the suspect has become the focus of
> the investigation.

Cherry v. Commonwealth, 14 Va. App. 135, 140, 415 S.E.2d 242, 245

(1992).

The record before us indicates that, when the three police

officers went to Navarrette's home, they explained to him that

they were there about M.N.'s case and asked him to voluntarily

-

come to the police station to answer some questions. Two officers were in plain clothes, and the uniformed officer was there to interpret for Navarrette and the other officers. No guns were displayed, and Navarrette was told he was not under arrest. He was never handcuffed. Navarrette had the opportunity to speak to other family members. Navarrette was allowed to return to his room to get his wallet before leaving, and Officer Ruiz assisted in finding the wallet with his flashlight.

When they left for the police station, Navarrette got into Officer Ruiz's vehicle on his own. The doors of the unmarked police car were unlocked, the car had no "cage," and the rear interior door handles were operational. Navarrette and his brother were told that the officers would bring them back home after the questioning.

At the police station Navarrette was given a Coke and permitted to use the bathroom. The door to the interview room was open. Neither of the officers present at the interview displayed a weapon. At the beginning of the interview Navarrette was again told that he was not under arrest, did not have to talk to the officers, and arrangements would be made to take him home if he wanted to leave. Navarrette was not constrained in any way prior to or during the interview. The officers remained calm throughout the interview.

Although Navarrette was a subject of Skeens' investigation, Skeens did not initially confront Navarrette with M.N.'s specific

-

allegations against him.  Instead, he told Navarrette that there were allegations that something might have happened between Navarrette and his niece and he wanted to get Navarrette's side of the story.  Eventually, Skeens revealed that M.N. was pregnant and that she had indicated Navarrette might be involved.  Skeens suggested M.N. may have forced Navarrette to do things against his will.  Only then did Navarrette admit he had had sexual intercourse with his niece, at which point Skeens placed him under arrest.

Considering the totality of the circumstances, we conclude that a reasonable man in Navarrette's shoes would not have considered himself in custody or otherwise deprived of his freedom of action in any significant way during the interview with Skeens. We hold, therefore, that Navarrette was not in custody for Miranda purposes.

Accordingly, the trial court did not err in refusing to suppress Navarrette's inculpatory statements.

## II.  SUFFICIENCY OF THE EVIDENCE

Navarrette contends the evidence was insufficient to establish the corpus delicti of the crime of rape because his extrajudicial confession was not sufficiently corroborated.  The Commonwealth contends Navarrette is procedurally barred from raising this argument on appeal because he made no such argument before the trial court.  Navarrette concedes he did not specifically raise the issue of corpus delicti in his motions to

-

strike.  He maintains, however, that his general sufficiency argument at trial was sufficient to preserve this issue for appeal.  In the alternative, Navarrette asks us to invoke the "ends of justice" exception to Rule 5A:18 to consider his claim.

Rule 5A:18 provides that "[n]o ruling of the trial court . . . will be considered as a basis for reversal unless the objection was stated together with the grounds therefor at the time of the ruling, except for good cause shown or to enable the Court of Appeals to attain the ends of justice."  "The purpose of the rule is to ensure that the trial court and opposing party are given the opportunity to intelligently address, examine, and resolve issues in the trial court, thus avoiding unnecessary appeals."  Andrews v. Commonwealth, 37 Va. App. 479, 493, 559 S.E.2d 401, 408 (2002).  Consequently, we "will not consider an argument on appeal which was not presented to the trial court." Ohree v. Commonwealth, 26 Va. App. 299, 308, 494 S.E.2d 484, 488 (1998).  Likewise, we will not consider an argument on appeal that is different from the specific argument presented to the trial court, even if it relates to the same general issue.  See Floyd v. Commonwealth, 219 Va. 575, 584, 249 S.E.2d 171, 176 (1978) (holding that only the same specific sufficiency argument presented to the trial court may be considered on appeal).

Here, it is clear the trial court had no opportunity to consider Navarrette's claim that his confession was not sufficiently corroborated to establish the corpus delicti.

-

Indeed, the only issue raised by Navarrette in his motion to strike was the sufficiency of the evidence to establish the dates cited in the indictments.  We hold, therefore, that, because the trial court never had the opportunity to consider whether Navarrette's confession was sufficiently corroborated to establish the corpus delicti, we are barred by Rule 5A:18 from considering that issue on appeal.

Moreover, our review of the record in this case does not reveal any reason to invoke the "ends of justice" exception to Rule 5A:18.  "[T]he ends of justice exception is narrow and is to be used sparingly . . . ."  Brown v. Commonwealth, 8 Va. App. 126, 132, 380 S.E.2d 8, 10 (1989).  "In order to avail oneself of the exception, a defendant must affirmatively show that a miscarriage of justice has occurred, not that a miscarriage might have occurred."  Redman v. Commonwealth, 25 Va. App. 215, 221, 487 S.E.2d 269, 272 (1997).  The defendant must show that he "was convicted for conduct that was not a criminal offense or the record must affirmatively prove that an element of the offense did not occur."  Id. at 221-22, 487 S.E.2d at 272-73.

> In every criminal prosecution, the Commonwealth must prove the element of corpus delicti, that is, the fact that the crime charged has been actually perpetrated. Further, if the accused has fully confessed that he committed the crime, then only slight corroboration of the confession is required to establish corpus delicti beyond a reasonable doubt.

-

<u>Cherrix v. Commonwealth</u>, 257 Va. 292, 305, 513 S.E.2d 642, 651 (1999) (citation omitted).

Here, Navarrette fully confessed to having sexual intercourse with M.N. on numerous occasions over a period of one and a half years. One of M.N.'s aunts testified that she saw Navarrette and M.N. together in M.N.'s bedroom with the door closed on several occasions. Another aunt testified that she observed the pair "kissing like a couple" when she entered the bedroom and found M.N. lying on top of Navarrette in the bed. The same aunt also testified that, on another occasion, she saw the pair in the bedroom watching a pornographic movie.

From this record, Navarrette does not affirmatively persuade us, as he must, that a miscarriage of justice has occurred. We hold, therefore, that the "ends of justice" exception does not require us to consider this argument on appeal.

Accordingly, we affirm Navarrette's convictions.

<u>Affirmed.</u>

-