UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present:  Judges Athey, Friedman and Raphael
Argued at Richmond, Virginia


JACK MARSHALL HEVERIN

                                                         MEMORANDUM OPINION[*] BY
v.          Record No. 1239-22-2                         JUDGE FRANK K. FRIEDMAN
                                                              MAY 14, 2024
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF MECKLENBURG COUNTY
S. Anderson Nelson, Judge

Catherine Lawler (Catherine Lawler Attorney at Law, PLLC, on
brief), for appellant.

Mason D. Williams, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Jack Marshall Heverin conspired with a group of individuals to invade a home and steal a

collection of guns in Mecklenburg County.[1]  A confidential informant alerted the sheriff's office

to the plan.  On the night of the attempted robbery, a tactical team of six deputies hid at the

---

[*] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] The sentencing order contains clerical errors concerning the indictment numbers of the felonious use of a firearm offenses for which the trial court convicted and sentenced Heverin. The trial court granted Heverin's motion to set aside the verdicts for charges of using a firearm in the commission of attempted malicious wounding, which were the indictments numbered CR20-195-13, -15, -17, -19, -21, and -23.  The trial court convicted and sentenced Heverin for using a firearm in the commission of attempted murder for the indictments numbered CR20-195-01, -03, -05, -07, -09, and -11.  The sentencing order contains another error for the indictment numbered CR20-195-16.  The sentencing order erroneously indicates that the charge was for aggravated attempted murder as a second offense when the charged crime was not for a subsequent offense.  We remand the case to the trial court to correct the clerical error under Code § 8.01-428 ("Clerical mistakes in all judgments or other parts of the record and errors therein arising from oversight or from an inadvertent omission may be corrected by the court at any time on its own initiative or upon the motion of any party and after such notice, as the court may order.").

targeted home awaiting Heverin and the three other armed men. A shootout ensued between Heverin, his accomplices, and the deputies. One of Heverin's accomplices was killed, and another was injured; none of the deputies were injured or killed. The deputies subsequently arrested Heverin and another male at the scene.

A jury in Mecklenburg County convicted Heverin of six counts of attempted aggravated murder of a law enforcement officer, one count of using a firearm in an attempted murder, five counts of using a firearm in the commission of attempted murder as a second offense, conspiracy to commit murder by a mob, attempted burglary, conspiracy to commit burglary, and conspiracy to commit robbery. The jury also convicted Heverin, upon his plea of nolo contendere, for possessing burglary tools.

Following the jury verdict, the trial court set aside all six of the predicate attempted malicious wounding convictions and the six accompanying use of a firearm convictions. The trial court also set aside the convictions of conspiracy to commit malicious wounding and conspiracy to commit malicious wounding as part of a mob. The other convictions stood, and the trial court sentenced Heverin to 6 life terms and 78 years of imprisonment, with all but 63 years suspended.

## BACKGROUND[2]

I. *Heverin and his coconspirators develop the plan to burglarize a home.*

On the afternoon of March 15, 2020, Nicole Whitlow discussed with Jonathan Watson, Heverin, and two others a plan to steal guns from Lois Owen's home. Heverin mentioned

---

[2] On appeal, we recite the facts "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). Doing so requires us to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

- 2 -

recruiting more people to help with the burglary. After Logan Lewis arrived at Whitlow's home, he, Watson, and Heverin left to "check out the house." Once the group returned, Heverin called Dakota Yancey (Dakota). Later, Austin Yancey (Austin) and Watson went to South Boston and returned with Zaquan Meadows and Dakota. Emily Spencer arrived at Whitlow's house after dark. The group had final discussions about the planned attack. Heverin mentioned that he would "hate to pistol whip an old lady, but he would." Heverin assigned Whitlow to drop off the group at the scene and Spencer to be "the watch-out" and to pick up the perpetrators afterward. When Watson expressed reservations about participating, Heverin said he would "do it by himself."

II. *The sheriff's office receives a tip about the burglary, and two tactical teams wait at the house.*

Unbeknown to Heverin and his cohorts, the Mecklenburg County Sheriff's Office received a tip from a confidential informant about the planned home invasion and robbery at Owen's home. The informant indicated that at least ten people armed with guns would be involved. The deputies listened while the confidential informant contacted one of the coconspirators by phone and confirmed that the attack would proceed as planned.

In response to the tip, the sheriff's office assembled a tactical team of six deputies to prevent the home invasion, and Owen left her house to stay with a relative. The six members of the tactical team—Deputy Jamie Thomas, Sergeant Travis Baisey, Sergeant Christopher Baird, Deputy Josh Carroll, Corporal Bruce King, and Sergeant Byrt Carnes—all wore uniforms and badges clearly identifying them as law enforcement officers. Deputy Carroll, Sergeant Baisey, and Corporal King comprised one team, and Deputy Thomas, Sergeant Baird, and Sergeant Carnes formed a second group. They were dropped off at Owen's home at about 9:30 p.m. on March 15, 2020, to wait for the perpetrators. The deputies on Sergeant Baisey's team hid in

shrubbery and vegetation at the front portion of the home near the porch; the other team went to the left side of the house and concealed themselves near some horse trailers.

Using Austin's truck, Whitlow drove Heverin, Watson, Meadows, and Dakota to the targeted house, which Heverin identified. They drove past it several times. Spencer also drove to the area in a silver car. All four men were armed with guns, were wearing masks, and wore dark clothing. Heverin had black socks on his hands. The men had duffle bags to transport the guns they planned to steal.

From their hiding places near the house, the deputies saw the dark blue Chevrolet pickup truck pass Owen's home more than four times. They also saw the silver sedan go by more than twice. Eventually, the sedan stopped at a turnoff about one-half mile from Owen's home. The truck went by Owen's house again, then stopped. Whitlow dropped Heverin, Watson, Meadows, and Dakota in a field near the house at about 1:00 a.m. The deputies watched four figures exit the truck and move across the yard toward the house. One of them passed within 20 feet of the bush where some of the deputies were hiding. Deputy Carroll commented that the individuals were "close enough to smell [him]."

As the group moved, Deputy Carroll saw the glow of a cell phone in the hand of one of the suspects. The glow then retreated to the property adjacent to Owen's home where a trailer was located. Upon hearing through their communication devices that Sergeant Baisey's team was preparing to engage with the retreating suspects, Sergeant Baird's team "took off running" from the rear of the house across the driveway and toward the front of the house.

III. *The deputies approached the group of coconspirators, and a shootout ensued.*

As Deputy Carroll, Corporal King, and Sergeant Baisey approached the group of suspects to confront them, a sedan appeared and moved slowly down the road in front of the house. Another cell phone belonging to one of the suspects lit up. When Deputy Carroll, Corporal King, and

Sergeant Baisey were about 50 yards from the suspects, Deputy Carroll shone his weapon-mounted flashlight on them; all 3 deputies yelled "sheriff's office" and ordered the suspects to show their hands. The person on the left of the group pulled out a gun and aimed it at the deputies. Sergeant Baisey yelled for Deputy Carroll to "kill" the light, and two distinct shots rang out from the group of suspects. Deputy Carroll observed two bright muzzle flashes, and Sergeant Baisey saw two individuals shoot. Sergeant Baisey heard the "buzzing" of a bullet go past his head.

The group of suspects scattered and fled when the deputies returned fire, and the deputies pursued them. One of the suspects ran to the right to the wood line. Deputy Carroll observed "at least six" muzzle flashes coming from three different directions. There were flashes from the wood line—directly to the deputies' right—and from down the roadway. Corporal King heard two "zippers" come by his face; the shots had been fired from the deputy's right—from the wood line. Corporal King saw three or four more flashes from the wood line, and the deputy returned fire in that direction. Sergeant Baird saw at least three muzzle flashes coming from the wood line.

As he ran toward the fleeing suspects, Deputy Carroll fired his gun about 19 times, and he felt dirt hitting his legs from bullets hitting the ground near him during the shootout. He went down on the ground. Corporal King fired five or six rounds with his gun. Deputy Carnes fired his gun between 10 and 25 times. The exchange of gunfire between the suspects and the deputies lasted 30 to 45 seconds. After the shooting stopped, Deputy Carroll and Corporal King heard a voice yelling and followed it to the wood line.

Near the edge of the woods, Deputy Carroll reactivated his light and spotted Heverin. Heverin's location was the source for at least two of the gunshots that were fired at the deputies and were "very loud." Heverin had socks on his hands and wore a mask. The deputies ordered him to the ground. Deputy Carroll took Heverin to the ground when he did not comply with the order.

Police officers who had been stationed at a church nearby arrived on the scene just after the shootout. As Special Agent Jay George approached the crime scene in his vehicle, he found Meadows walking on the shoulder to the left side of the road. Meadows was wearing one glove and had a firearm at his waist. Dakota was in the roadway; he was shot to death. A mask was covering Dakota's face. A gun was on the ground near Dakota's head. Watson was on the roadway not far from Dakota; Watson was shot in the neck and was gasping for air. Watson wore a mask over his face, and a handgun was beside him.

After he was detained, Heverin complained that he had been shot, but he had no gunshot wounds. Heverin said that the deputies did not have to shoot at them because they "gave up." He claimed that he had not been armed with a gun.

Using a trained canine on the day after the shootout, the police found a Firestorm 45 gun at the edge of the woods across the road from Owen's home. The police recovered two cartridge casings fired from the Firestorm 45; one was beside the gun and the other was between the roadway and the wood line. In the Firestorm 45 pistol was a cartridge case that had left the chamber but was not ejected from the gun.

IV. *Heverin disclosed details of the crime to his cellmate.*

Sharod Lee was Heverin's cellmate from April to July 2020. While in jail with Lee, Heverin said that he and others began planning the robbery two or three weeks before the night of the incident. Heverin learned of the large gun collection through a friend. Heverin told Lee that a person named "Dakota" and two females were also involved. One of the women was the driver, and the other was the lookout. Heverin said that he had a "weird feeling" as they approached the house and he "saw bodies." During the operation, one of the men was in contact with the lookout by phone. Heverin told Lee that one member of the group reached the porch of the house. Someone in the group said, "[O]h shit, that's twelve," a slang term for the police. After the deputies

yelled "freeze," someone fired a gun, then the group fled. Heverin admitted to Lee that he had a gun and that he fired it while running to escape in the woods. Heverin said he "shot till his clip was empty." Afterward, he tried to hide his gloves, mask, and gun.

ANALYSIS

I. *The evidence is sufficient to support Heverin's convictions.*

Heverin makes several sufficiency arguments on appeal. First, Heverin argues that the evidence at trial was insufficient to prove attempted burglary and thus the trial court erred when it denied both his motion to strike the evidence and motion to set aside the verdict on that basis. Second, Heverin asserts that the evidence only established a "larceny-based" conspiracy, not a conspiracy to commit robbery or burglary. Third, Heverin argues the evidence was insufficient to prove he had the intent required for attempted aggravated murder. Fourth, Heverin asserts that because the evidence failed to prove he committed six attempted aggravated murders the evidence was also insufficient to prove that he used a firearm during those six attempted murders. Fifth, and finally, Heverin insists that there was no evidence to suggest he conspired to commit murder by mob. Heverin's arguments lack merit and are addressed fully below.

"On review of the sufficiency of the evidence, 'the judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *Ingram v. Commonwealth*, 74 Va. App. 59, 76 (2021) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "The question on appeal, is whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Yoder v. Commonwealth*, 298 Va. 180, 182 (2019)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *Chavez v.*

- 7 -

*Commonwealth*, 69 Va. App. 149, 161 (2018) (quoting *Banks v. Commonwealth*, 67 Va. App. 273, 288 (2017)).

>  A. *The evidence in the record is sufficient to lead a reasonable factfinder to the conclusion that Heverin's actions were more than mere preparations toward the commencement of a burglary.*

Heverin argues that the evidence at trial was insufficient to prove attempted burglary and thus the trial court erred when it denied both his motion to strike the evidence and motion to set aside the verdict on that basis. Heverin explains that the evidence did not show any "direct act undertaken towards the commencement of a burglary." The Commonwealth replies by arguing "there was ample evidence of both preparation and an overt step taken towards the attempt, and although [Heverin] withdrew from the house, this was *after* the attempt had already been completed." The evidence in the record supports the Commonwealth's argument that Heverin did not abandon his plan, and instead took several overt steps towards the commencement of burglarizing the Owens' home. Thus, the trial court did not err in denying Heverin's motions.

"An attempt to commit a crime is composed of two elements: (1) the intent to commit it; and (2) a direct, ineffectual act done towards its commission." *Thacker v. Commonwealth*, 134 Va. 767, 769 (1922).

> [T]he common law generally informs us that "to constitute an act of attempt, the act must possess four characteristics: first, it must be a step toward a punishable offense; second, it must be apparently (but not necessarily in reality) adapted to the purpose intended; third, it must come dangerously near to success; fourth, it must not succeed."

*Jones v. Commonwealth*, 70 Va. App. 307, 317-18 (2019) (en banc) (quoting J.H. Beale, Jr., *Criminal Attempts*, 16 Harv. L. Rev. 491, 492 (1903)). "The act must reach far enough towards the accomplishment of the desired result to amount to the commencement of the consummation." *Thacker*, 134 Va. at 769-70. "However, '[t]he question as to what is [an overt] act, is often a difficult one to determine, and no general rule, which can be readily applied as a test to all cases,

- 8 -

can be laid down . . . . Each case must, therefore, be determined upon its own facts.'" *Jones*, 70 Va. App. at 318-19 (alterations in original) (quoting *Jay v. Commonwealth*, 275 Va. 510, 525 (2008) (quoting *Hicks v. Commonwealth*, 86 Va. (11 Hans.) 223, 226 (1889) (reversing a defendant's conviction for attempted poisoning and concluding that obtaining a poisonous substance and soliciting another to put it in an intended victim's coffee amounted to mere preparation))). In other words, whether an act is criminal is a question for the trier of fact, unless the trier of fact is plainly wrong. Furthermore, "[w]hile the overt acts of the accused [need not be] the last proximate acts necessary to the consummation of the crime, they [must be] direct overt acts well calculated to accomplish the result intended." *Jay*, 275 Va. at 526 (second and third alterations in original) (citation omitted).

Heverin concedes in his brief that the evidence established a conspiracy to steal firearms from the home in Mecklenburg County. Heverin argues that there was no overt act that would escalate the actions of Heverin and his coconspirators to criminal attempt. Heverin asserts that the facts in this case are analogous to the facts in *Jones*. *Jones*, 70 Va. App. at 318-19. In *Jones*, this Court, sitting en banc, examined Virginia's jurisprudence on the crime of attempt and reversed and remanded a circuit court's conviction of attempted robbery. *Id.* at 319, 324. Here, as opposed to in *Jones*, the crime is attempted burglary, not robbery. Code § 18.2-90 states that if "any person . . . in the daytime breaks and enters . . . a dwelling house . . . with intent to commit murder, rape, robbery or arson . . . he shall be deemed guilty of statutory burglary." It stands to reason, then, that the overt act would be any action taken to commence breaking and entering a dwelling.

The evidence in the record shows that Heverin and his coconspirators: discussed the plan to burglarize the home, cased the house, wore dark clothing to conceal themselves to enter the home, took guns to the property, drove to the house, approached the house, and came within 20

feet of the home. One of the coconspirators even expressed concerns about continuing with the plan, and Heverin insisted, stating that he would "do it by himself." Heverin did not abandon his plan, and instead took several overt steps toward the commencement of burglarizing the Owens' home. Thus, it was not error for the trial court to deny Heverin's motions to strike and set aside the verdict as to the attempted burglary.

B. *Heverin's statements support a finding that he conspired to commit robbery and burglary.*

In his second argument, Heverin asserts that the evidence only established a "larceny-based" conspiracy, not a conspiracy to commit robbery or burglary which includes the intent to commit some form of violent crime. Code § 18.2-90. The Commonwealth responds by arguing that a reasonable factfinder could determine that Heverin harbored the intent to commit a robbery-based conspiracy based on statements Heverin made about Mrs. Owen.

A conspiracy is "an agreement between two or more persons by some concerted action to commit an offense." *Speller v. Commonwealth*, 69 Va. App. 378, 389 (2018) (citation omitted). Conspiracy is a specific intent crime that "requires a shared intent and joint action." *See Abdo v. Commonwealth*, 64 Va. App. 468, 476 (2015). The Commonwealth "need not prove an explicit agreement." *Gray v. Commonwealth*, 30 Va. App. 725, 736 (1999). Instead, as with any crime, the elements of a conspiracy, including the existence of an agreement, "may be proved by circumstantial evidence." *Floyd v. Commonwealth*, 219 Va. 575, 580 (1978).

Here, there was an agreement and the shared specific intent to commit a robbery by "taking, with intent to steal, . . . the personal property of another, from his person or in his presence, against his will, by violence or intimidation." *Jones*, 70 Va. App. at 316-17 (defining robbery) (internal quotations omitted). Heverin was willing to use force if necessary to steal the guns. While planning the invasion, Heverin stated that "he'd hate to have to pistol whip an old

- 10 -

lady if she was there, but he would."[3]  Even where an assailant may not plan to use violence, if an owner of personal property attempts "to prevent a thief from taking the property, and the force and violence used to overcome the opposition to the taking is concurrent or concomitant with the taking, the thief's action constitutes robbery."  *Beard v. Commonwealth*, 19 Va. App. 359, 364 (1994) (citation omitted).  Heverin's statement certainly tends to show the state of his mind, that he was willing and able to use violence.  *Cf. Nobles v. Commonwealth*, 218 Va. 548, 551 (1977) ("While this may have been a conditional threat, and while no overt act appears to have occurred after the threat was made, *the statement tended to show the state of mind of the defendant . . . .*" (emphasis added)); *see also United States v. Simmons*, 999 F.3d 199, 229 (4th Cir. 2021) ("Under the common law, the 'specific intent to commit a wrongful act may be conditional'; '[a]n intent to kill, in the alternative, is nevertheless an intent to kill.'" (alteration in original) (citation omitted)).  Because the evidence supports the finding that Heverin planned to commit a robbery upon breaking and entering into a residence, the evidence also supports finding Heverin guilty of conspiring to commit burglary.

Regardless, intent is a factual determination, and the jury here determined that Heverin possessed the requisite intent for both robbery and burglary.  *See Haywood v. Commonwealth*, 20 Va. App. 562, 565-66 (1995) ("[W]hether the required intent exists is generally a question for the trier of fact." (alteration in original) (quoting *Nobles*, 218 Va. at 551)).  That determination was supported by the evidence in the record and was not plainly wrong.

---

[3] "Intent may be shown by a person's conduct and by his statements."  *Summerlin v. Commonwealth*, 37 Va. App. 288, 297-98 (2002).

C. *The evidence was sufficient to find Heverin guilty of attempted aggravated murder for all six deputies and for the use of a firearm in the commission of the attempted aggravated murders.*

For his third argument, Heverin raises three possible theories upon which he argues the case should be reversed and remanded as it relates to the charges of attempted aggravated murder. Specifically, Heverin argues that the Commonwealth failed to prove (1) that Heverin was the triggerman for all six attempted murders, (2) that Heverin took six overt acts towards attempting to murder each of the six deputies, and (3) that Heverin had the specific intent to murder each deputy.

### 1. *The "Triggerman" Rule*

Heverin argues that, under the "triggerman rule," only the individual who caused a death may be convicted of aggravated murder under Code § 18.2-18; thus, the Commonwealth had to show that Heverin both fired a weapon and that he fired it six times to support the six convictions. The Commonwealth responds by arguing that Heverin misinterprets Code § 18.2-18.

The "triggerman rule" is defined in Code § 18.2-18:

> In the case of every felony, every principal in the second degree . . . may be indicted, tried, convicted and punished in all respects as if a principal in the first degree; provided, however, that . . . [a] principal in the second degree to an aggravated murder shall be indicted, tried, convicted and punished as though the offense were murder in the first degree.

Under the plain language of the statute, only a principal in the first degree to an aggravated murder may be convicted of aggravated murder. A principal in the second degree to an aggravated murder is guilty only of first-degree murder. *See* Code § 18.2-18; *Cheng v. Commonwealth*, 240 Va. 26, 42 (1990); *Johnson v. Commonwealth*, 220 Va. 146, 149 (1979).

We agree that Heverin has misapplied the triggerman code section with respect to attempted aggravated murder. Under well-established principles of statutory construction,

- 12 -

reviewing courts look to the plain meaning of the words contained in a statute to determine the General Assembly's intent. *Elliott v. Commonwealth*, 277 Va. 457, 463 (2009). Code § 18.2-18 excludes principals in the second degree to aggravated murder from the rule by stating "principal[s] in the second degree to an aggravated murder shall be indicted, tried, convicted and punished as though the offense were murder in the first degree." The statute does not exclude principals in the second degree to *attempted* aggravated murder from being punished as a principal in the first degree. Accordingly, Heverin's argument fails, and he could be convicted as a principal in the second degree to attempted aggravated murder and tried, convicted, and punished for the underlying offense.

### 2. *Overt Acts*

Heverin next argues that the evidence at trial was insufficient to prove that he committed six overt acts which provide the basis for the six attempted aggravated murders. This argument also fails. As discussed above the "triggerman rule" does not apply to *attempted* aggravated murder, Heverin, therefore, could be (and was) found guilty as a principal in the second degree based on the concert of action theory of conspiracy as there was evidence that Heverin's group fired far more than six shots at the deputies.

The Commonwealth did not need to prove that Heverin was individually responsible for each of the six attempted aggravated murders, even though the evidence supported that inference.[4] Through the concert of action theory, Heverin was liable for his coconspirators'

---

[4] On the night of the attempted burglary, Heverin was found near the edge of the woods after the shootout. Heverin's location was the source for at least two of the gunshots that were fired at the deputies. Using a trained canine on the day after the shootout, the police found a Firestorm 45 gun at the edge of the woods, where Heverin was located. The police recovered two cartridge casings fired from the Firestorm 45; one was beside the gun and the other was between the roadway and the wood line. In the Firestorm 45 pistol was a cartridge case that had left the chamber but was not ejected from the gun. As testified to at trial, a Firestorm 45 "magazine can hold seven, and it can hold one in the chamber. So maximum of eight." However, the Firestorm 45 "was found inbattered with a cartridge case still – it was extracted

- 13 -

actions as well as his own. Concert of action is a "species of accomplice liability, carrying with it the principle that the punishment imposed on each accomplice may be the same." *Davis v. Commonwealth*, 36 Va. App. 291, 295-96 (2001). "If there is concert of action" and "the resulting crime" is "one of the incidental probable consequences, then whether" that result "was originally contemplated or not, all who participate" in bringing about the consequence "are equally answerable and bound by the acts of every other person" or people. *Spradlin v. Commonwealth*, 195 Va. 523, 528 (1954).

Heverin did not challenge the sufficiency of the evidence regarding whether there was a concert of action. Instead, Heverin concedes that "Mr. Yancey [Dakota], Mr. Meadows, and Mr. Watson were all shooters." Because all four shooters were acting in concert, even if Heverin had not fired any shots, he is liable for the conduct of his coconspirators. *See Carter v. Commonwealth*, 232 Va. 122, 126 (1986) (holding that, when defendant's coconspirator to robbery shot and killed robbery victim, "each co-actor is criminally responsible for the shooting, even those who did not intend it or anticipate that it would occur"); *see also Boggs v. Commonwealth*, 153 Va. 828, 836 (1929) ("[E]veryone connected with carrying out a common design to commit a criminal act is . . . bound by the act of any member of the combination, perpetrated in the prosecution of the common design.").

Nevertheless, the evidence at the trial showed that Heverin could have shot his gun at least six times, thus fulfilling the six overt acts required for the attempted murder charges. Firearms experts testified that the gun found at the wood line (the gun attributed to Heverin) had the capacity to shoot eight bullets. That gun was, however, "stove-piped," meaning it was jammed. There were two live rounds remaining in the gun; meaning six shots could have been

_____

from the chamber, but it was not ejected from the weapon; [and] [t]he magazine had two more cartridges in it." Therefore, it is well within the evidence to support an inference that Heverin could have shot the gun at least 6 times, jamming the gun on the sixth shot.

fired. Furthermore, multiple deputies testified to seeing muzzle flashes coming from the wood line where Heverin was found. Heverin was arrested near the wood line after the shooting stopped. Lee, Heverin's cellmate, also testified that Heverin shot his gun "till his clip was empty." Considering all the evidence together, a reasonable factfinder could conclude that Heverin fired at least six shots from the wood line and thus he committed six overt acts.

### 3. *The Specific Intent to Kill*

Heverin argues that he lacked the required specific intent for each of the six attempted aggravated murder charges. Heverin insists that he did not intend to kill each of the six deputies. The intent required, however, is merely that Heverin intended to kill someone, not a particular person.

The crime of attempted murder requires two proven elements, the specific intent to kill the victim and "evidence of some overt but ineffectual act in furtherance of this purpose." *Hargrave v. Commonwealth*, 214 Va. 436, 437 (1974). Specific intent is the "intent to accomplish the precise criminal act that one is later charged with." *Winston v. Commonwealth*, 268 Va. 564, 600 (2004). The specific intent to kill for attempted murder is "the intent to kill a human being, not a *particular* human being." *Secret v. Commonwealth*, 296 Va. 204, 231 (2018) (quoting *People v. Stone*, 205 P.3d 272, 274 (Cal. 2009)). Heverin's argument—that the Commonwealth needed to prove he had the specific intent to kill all six deputies—is therefore not based on any valid legal theory for the intent required to be convicted of attempted murder.

The evidence shows that Heverin *did* know that the people shooting at him were law enforcement officers. The deputies announced their presence and illuminated the group of coconspirators; Heverin also told his cellmate that he saw bodies and that someone in his group yelled "oh shit, that's twelve," slang for the police. The jury could therefore reasonably infer that Heverin knew the "bodies" he saw and the people he was shooting at were law enforcement.

- 15 -

And, because he and the coconspirators were engaging in criminal activity, the jury could also infer that Heverin shot at the deputies to interfere with their official duties. Because "[i]t is entirely 'permissible to infer,' as the trial court did, 'that every person intends the natural and probable consequences of his or her acts.'" *Walker v. Commonwealth*, 47 Va. App. 114, 121 (2005) (quoting *Schmitt v. Commonwealth*, 262 Va. 127, 145 (2001); and citing *Gilbert v. Commonwealth*, 45 Va. App. 67, 71 (2005)).[5]

> D. *The evidence was sufficient to support Heverin's conviction of conspiracy to commit murder by mob.*

Heverin insists that there was no evidence to suggest he conspired to commit murder by mob.[6] Heverin argues that there was no underlying preconceived agreement between him and his coconspirators to commit murder. The Commonwealth rebuts by stating that the jury could infer an agreement to commit murder.

Conspiracy to commit murder "may be proved by circumstantial evidence. Indeed, because of the very nature of the offense, 'it often may be established only by indirect and circumstantial evidence.'" *Gray v. Commonwealth*, 260 Va. 675, 680 (2000) (quoting *Floyd*, 219 Va. at 580 (affirming the conviction of conspiracy to commit murder based on

---

[5] The evidence was also sufficient to find Heverin guilty of using a firearm in the commission of six attempted aggravated murders. Heverin asserts that because the evidence failed to prove he committed six attempted aggravated murders that his six convictions for use of a firearm during those crimes should also be reversed. As discussed above, the evidence was sufficient to prove the six attempted murder convictions, thus the evidence also supports Heverin's convictions of the use of the firearm in commission of those attempted murders.

[6] Heverin was indicted on conspiracy to commit robbery by mob (case number CR20-195-28), but the indictment was amended without objection to remove the mob language, leaving just conspiracy to commit robbery. The conviction and sentencing order, when referencing CR20-195-28, referred to it as conspiracy to commit robbery by mob. The jury verdict form did not include the mob language. Further, the court, when sentencing Heverin on the indictment ending in -28, referred to it as conspiracy to commit robbery, excluding any mention of the term "mob." It therefore appears that Heverin was not convicted of conspiracy to commit robbery by mob and that the conviction and sentencing order which state otherwise are clerical errors, as referred to in note 1.

circumstantial evidence)).  "In Virginia, the crime of conspiracy is complete when the parties agree to commit an offense.  No overt act in furtherance of the underlying crime is necessary." *Id.* (citing *Falden v. Commonwealth*, 167 Va. 542, 544 (1937); and *Stevens v. Commonwealth*, 14 Va. App. 238, 241 (1992)).

Furthermore, "[a]ny collection of people, assembled for the purpose and with the intention of committing an assault or a battery upon any person or an act of violence as defined in § 19.2-297.1, without authority of law, shall be deemed a 'mob.'"  Code § 18.2-38.  "The statutory definition of a mob requires that the act of assembling be done for a specific purpose and with a specific intent — to commit an assault or a battery without lawful authority." *Harrell v. Commonwealth*, 11 Va. App. 1, 6 (1990).  "[I]t is only when one member of a mob commits one of the crimes enumerated in Code §§ 18.2-39 to 18.2-42.1 that all members of the mob can be held collectively responsible solely because of their mob membership." *Paiz v. Commonwealth*, 54 Va. App. 688, 697 (2009).  Thus, "the Commonwealth must prove that at some point the group or some of its members 'assembled' for the purpose and with the intention of assaulting other people." *Harrell*, 11 Va. App. at 10.

Heverin and his coconspirators armed themselves with firearms before making their way to the target home.  Heverin also indicated that he would use violence if he needed to, and he in fact did fire his gun.  Heverin admitted to his cellmate that he had a gun and that he fired "till his clip was empty."  Furthermore, once confronted by the deputies, the group began shooting their firearms at the deputies instead of immediately surrendering peacefully.  A reasonable jury could find, based on all this evidence together, that the group had either a spoken or unspoken agreement to commit murder by mob if they received any resistance to their burglary plans.

II. *The trial court did not violate Heverin's constitutional rights.*

Heverin's second set of arguments present constitutional issues. "On appeal, the constitutional arguments are questions of law that we review de novo." *Shivaee v. Commonwealth*, 270 Va. 112, 119 (2005). Heverin first argues that the trial court violated his constitutional rights by limiting his presentation of evidence and cross-examination regarding the lack of body-worn camera recordings from the night of the attempted burglary. Heverin next argues that the trial court violated his constitutional protections against multiple punishments due to his multiple convictions for attempted aggravated murder. We will address each argument in turn.

A. *The trial court did not err by limiting Heverin's presentation of evidence regarding the deputies' body-worn cameras.*

A trial court's decisions on the limitation of cross-examination and whether to admit or exclude evidence are reviewed for an abuse of discretion. *See Commonwealth v. Proffitt*, 292 Va. 626, 632 (2016). An abuse of discretion occurs "[o]nly when reasonable jurists could not differ[.]" *Turner v. Commonwealth*, 65 Va. App. 312, 327 (2015). "Cross-examination of prosecution witnesses 'is "fundamental to the truth-finding process and is an absolute right guaranteed to an accused by the confrontation clause of the Sixth Amendment."'" *Maynard v. Commonwealth*, 11 Va. App. 437, 444 (1990) (en banc) (quoting *Williams v. Commonwealth*, 4 Va. App. 53, 77-78 (1987)). "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination." *Lambert v. Commonwealth*, 70 Va. App. 740, 753 (2019) (citation omitted). Courts "may appropriately limit cross-examination, subject to the rules of evidence. For example, a trial court may, in its discretion, refuse to allow questions that seek information lacking relevance to any issue before the court . . . ." *Campbell v. Campbell*, 49 Va. App. 498, 504-05 (2007); *see also Castillo v. Commonwealth*, 70 Va. App. 394, 462 (2019) (concluding that the trial court did not abuse its

discretion by limiting cross-examination regarding circumstances not relevant to a material issue at trial). A defendant needs to show that the evidence went directly to the issue of bias to prove that the exclusion of that same evidence was unconstitutional. *Harrison v. Commonwealth*, 56 Va. App. 382, 389 (2010) (quoting *United States v. Hill*, 322 F.3d 301, 304 (4th Cir. 2003)).

The Commonwealth argued during a motions hearing that Heverin should be prohibited from inquiring into or presenting evidence regarding the lack of officer body camera footage from the shootout. Heverin replied by arguing that the Commonwealth had changed its explanation why the body camera footage was not recorded by first saying it was not recorded because the cameras have a red light active when recording and then stating that the department made a strategic decision not to record despite there being a "Stealth Mode" on the camera. The Commonwealth rebutted Heverin's position by explaining that the deputies followed the Stealth Mode policy and that the deputies were concerned with following appropriate policy and federal law while carrying out a tactical maneuver that included communications based on classified and confidential information.[7] Heverin did not respond to that explanation. The Commonwealth also supplied the trial court with the sheriff's office's policy regarding body camera footage.

Heverin now argues that he should have been allowed to present evidence and cross-examine the deputies to challenge their credibility or to establish bias. Heverin has not, however, argued how the proposed evidence would go "to the issue of bias of the witness or motive of the witness to fabricate.'" *Id.* (quoting *Hill*, 322 F.3d at 304). The Commonwealth gave an explanation regarding the lack of body camera footage and Heverin failed to offer any evidence refuting that explanation. For the trial court to rule in his favor, Heverin was required to show

---

[7] The Commonwealth argued that delving into the policies at issue would create a lengthy and irrelevant trial within a trial. The Commonwealth further noted that stealth mode (filming without the light on) makes it difficult to know when recording is occurring and that this can be a particular problem when officers are staking out a location over several hours and striving to protect the identity of confidential information.

- 19 -

more than the absence of the body camera footage. The fact that the body camera footage was absent does not, by itself, prove any wrongdoing or bias by the deputies, especially because the Commonwealth argued that the department followed its policies. Thus, it was neither unconstitutional nor an abuse of discretion for the trial court to exclude evidence of the lack of body camera footage, especially given the unique circumstances of this case. *See id.*; *see also Proffitt*, 292 Va. at 634.

B. *The trial court did not err by convicting Heverin of six counts of attempted aggravated murder.*

Heverin attempts to argue that the trial court violated his constitutional protections against multiple punishments due to his multiple convictions for attempted aggravated murder. However, because, as stated previously, the evidence was sufficient to convict Heverin of all six attempted murder charges, the trial court did not violate Heverin's constitutional protections. As stated previously, there was enough evidence to support Heverin firing his gun six times and thus there were six separate criminal acts by Heverin, all punishable without violating double jeopardy. *See Roach v. Commonwealth*, 51 Va. App. 741, 748 (2008) ("The Double Jeopardy Clause is not abridged if an accused is subjected to punishment for two offenses that are supported by separate and distinct acts."). Thus, Heverin fails to establish on appeal why his convictions should be reversed on those grounds.

III. *The trial court did not err in granting the Commonwealth's concert of action jury instruction and in denying Heverin's heat of passion jury instruction.*

Heverin makes two jury instruction arguments: (1) that the trial court erred in granting the Commonwealth's concert of action jury instruction and, (2) that the court also erred in denying Heverin's heat of passion jury instruction.

"As a general rule, the matter of granting and denying instructions . . . rest[s] in the sound discretion of the trial court." *Dandridge v. Commonwealth*, 72 Va. App. 669, 679 (2021)

(quoting *Lienau v. Commonwealth*, 69 Va. App. 254, 264 (2018)). "The trial court's 'broad discretion in giving or denying instructions requested' is reviewed for an abuse of discretion." *Id.* (quoting *King v. Commonwealth*, 64 Va. App. 580, 586 (2015) (en banc)). "Our sole responsibility in reviewing [jury instructions] is to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises." *Pena Pinedo v. Commonwealth*, 300 Va. 116, 121 (2021) (quoting *Cooper v. Commonwealth*, 277 Va. 377, 381 (2009)). "When reviewing a trial court's refusal to give a proffered jury instruction, we view the evidence in the light most favorable to the proponent of the instruction." *Id.* at 118 (quoting *Commonwealth v. Vaughn*, 263 Va. 31, 33 (2002)).

A. *The trial court did not err by granting the Commonwealth's concert of action jury instruction.*

Heverin argues the trial court erred by granting the Commonwealth's concert of action jury instruction. Heverin argues that this was error for two reasons: (1) that the jury instruction did not "apprise the jury that the Commonwealth must prove Mr. Heverin's specific intent," and (2) the "Commonwealth was required to prove that Mr. Heverin was a triggerman to secure an attempted aggravated murder conviction." Heverin is wrong on both accounts.

A jury instruction is "proper only if supported by more than a scintilla of evidence." *Avent v. Commonwealth*, 279 Va. 175, 202 (2010). Here, the burden on this Court is to ensure "that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises." *Pena Pinedo*, 300 Va. at 121 (quoting *Cooper*, 277 Va. at 381).

As stated previously, concert of action is a "species of accomplice liability, carrying with it the principle that the punishment imposed on each accomplice may be the same." *Davis*, 36 Va. App. at 295-96. The concert of action jury instruction states:

> If there is concert of action with the resulting crime or one of its incidental probable consequences, then whether such crime was originally contemplated or not, all who participate in any way in

- 21 -

bringing it about are equally answerable and bound by the acts of every other person connected with the consummation of such resulting crime.

The concert of action jury instruction is nearly identical to the language from *Spradlin*:

If there is concert of action with the resulting crime one of its incidental probable consequences, then whether such crime was originally contemplated or not, all who participate in any way in bringing it about are equally answerable and bound by the acts of every other person connected with the consummation of such resulting crime.

195 Va. at 528. Thus, the jury instruction clearly states the law.

Now we turn to whether the instruction covers an issue which the evidence fairly raised. Here it does. Concert of action is an accepted theory of culpability for attempted murder. *See Epps v. Commonwealth*, 216 Va. 150 (1975) (affirming an attempted murder conviction for the defendant when it was one of the defendant's coconspirators who fired a weapon at the victim and missed). The Commonwealth put on more than enough evidence to support the theory that Heverin was working with his coconspirators to commit a burglary and in the course of the commission of that crime he and his coconspirators engaged in a shootout with the deputies. Thus, it was not error for the trial court to give this instruction.

As to Heverin's argument that the instruction leaves out the so-called "Triggerman" theory, he is wrong for the same reasons as previously discussed. Namely, Heverin's misapplication of the triggerman code section, as it has nothing to do with attempted aggravated murder. As stated previously, Code § 18.2-18 excludes principals in the second degree to aggravated murder from the rule by stating "principal[s] in the second degree to an aggravated murder shall be indicted, tried, convicted and punished as though the offense were murder in the first degree." The statute does not exclude principals in the second degree to *attempted* aggravated murder from being punished as a principal in the first degree. Accordingly, Heverin's argument on the jury instruction fails.

- 22 -

B. *The trial court did not err by refusing to grant his heat of passion jury instruction.*

Heverin argues that the trial court erred by rejecting his proposed "heat of passion" jury instruction. Heverin, however, failed to properly preserve this argument during the trial below. Heverin points to two places in the record where he allegedly preserved this jury instruction argument. Neither of those cites, however, indicate Heverin preserved this argument for appeal. Heverin's motion to set aside the verdict is located at R. 704-23; at no point in that motion did Heverin raise an argument regarding the heat of passion jury instruction. Instead, Heverin mentions heat of passion as it relates to the required malice intent towards law enforcement officers.

At R. 2767, the transcript reflects that Heverin objected to the *malice* jury instruction, arguing that the instruction should also "say that self-defense negates malice." During the hearing on the motion to set aside the verdict, Heverin mentions heat of passion in relation to self-defense, stating "[a]s it relates to malice, there can't be--there can't be any heat of passion, self-defense, things of the such." Heverin goes on to state that "[t]here are complicated facts as they relate to case law because you don't normally have purported victims firing at would-be defendants, certainly not 60-plus rounds, but this is not a case that is free of heat of passion, that is free of self-defense genre elements." Heverin fails, however, to demonstrate that he sought or proffered an instruction regarding heat of passion below. We do not believe Heverin's argument regarding this jury instruction is preserved. Rule 5A:18, *see also Edwards v. Commonwealth*, 41 Va. App. 752, 761 (2003) (en banc).[8]

---

[8] Even if Heverin's arguments were properly preserved, a heat of passion jury instruction would have been improper in this case. When confronted by the deputies, the would-be invaders tried to shoot their way to an escape. "A defendant is entitled to have the jury instructed only on those theories of the case that are supported by [more than a scintilla of] evidence." *Eaton v. Commonwealth*, 240 Va. 236, 255 (1990) (citation omitted). A "trial court does not abuse its discretion by refusing [an] instruction [offered by a party] if it 'is not applicable to the facts and

CONCLUSION

As to his convictions, Heverin has not shown that the trial court erred. Thus, we affirm Heverin's convictions. Nonetheless, we are remanding the case for correction of the clerical errors in the sentencing order. *See supra* n.1 and n.6.

*Affirmed and remanded.*

---

circumstances of the case,' or if it 'would have created confusion and would have been misleading.'" *Juniper v. Commonwealth*, 271 Va. 362, 431 (2006) (citation omitted). To benefit from a heat of passion defense, the "accused must show that he committed the crime with 'passion' and upon 'reasonable provocation.'" *Graham v. Commonwealth*, 31 Va. App. 662, 671 (2000) (quoting *Caudill v. Commonwealth*, 27 Va. App. 81, 85 (1998)).